No. 55,594

Irvin L. Durflinger, Raymond Durflinger, and Ronald Durflinger, *Plaintiffs*, v. Benjamin Artiles, Preciosa Rosales and Eduardo Medrano, *Defendants*.

(673 P.2d 86)

Opinion filed De-

cember 2, 1983.

*Deborah Carney,* of Turner and Boisseau, Chartered, of Great Bend, argued the cause, and *Christopher Randall* and *Casey R. Law,* of the same firm, were with her on the briefs for plaintiffs.

*Mary Beth Mudrick,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, and *Reid Stacey,* assistant attorney general, were with her on the briefs for defendants.

*John E. Wilkinson,* of Topeka, was on the *amicus curiae* brief for the Kansas Psychiatric Association.

*Sheila M. Janicke,* of Shawnee Mission, was on the *amicus curiae* brief for the Kansas Trial Lawyers Association.

*Mary Beth Blake,* of Fallon, Holbrook & Ellis, of Kansas City, was on the *amicus curiae* brief for the State of Kansas and State Treatment Facilities.

*John E. Shamberg, Lynn R. Johnson* and *Ruth M. Benien,* of Schnider, Shamberg & May, Chartered, of Shawnee Mission, were on the *amicus curiae* brief for party-plaintiffs in complaints numbered 80-2095 and 83-2094 filed in the United States District Court for the District of Kansas.

The opinion of the court was delivered by

McFARLAND, J.: This case comes before us on a certification from the United States Court of Appeals, Tenth Circuit, under authority of the Uniform Certification of Questions of Law Act, K.S.A. 1982 Supp. 60-3201 *et seq.*

The two certified questions are:

I.  WOULD THE KANSAS SUPREME COURT RECOGNIZE AS A VALID CAUSE OF ACTION A CLAIM WHICH GREW OUT OF A NEGLIGENT RELEASE OF A PATIENT WHO HAD VIOLENT PROPENSITIES, FROM A STATE INSTITUTION, AS DISTINGUISHED FROM NEGLIGENT FAILURE TO WARN PERSONS WHO MIGHT BE INJURED BY THE PATIENT AS THE RESULT OF THE RELEASE?

II. DO STAFF DOCTORS AS, DISTINGUISHED FROM THE SUPERINTENDENT OR HEAD OF THE HOSPITAL OR INSTITUTION, HAVE LEGAL IMMUNITY UNDER KANSAS LAW FROM CIVIL LIABILITY RESULTING FROM A RELEASE OR FAILURE TO WARN OF THE RELEASE OF A DANGEROUS PATIENT?

The factual background giving rise to the litigation may be summarized as follows. On December 25, 1973, Butler and Carol Elliott returned to their Hutchinson, Kansas, home after a few

days' absence. As they walked into their home, the Elliotts were confronted by their nineteen-year-old grandson, Bradley Durflinger, who was armed with a hatchet and a meat fork. It was Bradley's intention to kill his grandparents and steal their automobile. The planned attack was averted. The following day Butler Elliott filed a petition in the probate court of Reno County, Kansas, seeking commitment of Bradley to a mental hospital on the grounds he was, or probably would become, dangerous to himself or to the person or property of others. Bradley had a history of disciplinary problems. He had run away from home on numerous occasions. His United States Navy service had ended in discharge after he was absent without leave. In March, 1973, Bradley attempted suicide and in November, 1973, Bradley was placed on probation for shoplifting. The probate court found Bradley to be a mentally ill person and ordered he be given care or treatment at the Larned State Hospital in Larned, Kansas.

On January 8, 1974, the Elliotts delivered Bradley to the Larned State Hospital. Bradley was diagnosed by the hospital as having a passive-aggressive personality with sociopathic tendencies. On April 19, 1974, Bradley was discharged from the hospital as being no longer in need of care or treatment. On that day, the Elliotts picked Bradley up at the hospital and a few days later put him on a commercial airliner bound for Oregon in order that Bradley could reside with his parents and siblings. A week after his discharge, Bradley killed his mother (Margaret Durflinger) and his younger brother (Corwin Durflinger) by shooting each person several times with a rifle. Bradley was subsequently convicted of the two homicides and was sentenced to serve time in the Oregon penal system.

On March 25, 1975, this wrongful death action was commenced in the United States District Court for the District of Kansas. The plaintiffs are Irvin L. Durflinger (husband of Margaret and father of Corwin) and Raymond and Ronald Durflinger (sons of Margaret and brothers of Corwin). Defendants named in the action were all doctors employed at Larned State Hospital during the time of Bradley Durflinger's confinement at that institution. Liability was predicated on the alleged negligent release of Bradley from the hospital. Dr. G. W. Getz was granted summary judgment on the basis that, as superintendent of the

hospital, he was a public officer acting pursuant to a special statutory duty when he approved Bradley's hospital dismissal (K.S.A. 1973 Supp. 59-2924). Dr. Francisco Izaguirre (psychiatrist) was dismissed from the action on the basis of improper service. Dr. Terry Keeley (psychologist) settled with plaintiffs immediately before trial. The present defendants are Dr. Benjamin Artiles (psychiatrist and hospital clinical director), Dr. Preciosa Rosales (attending physician) and Dr. Eduardo Medrano (ward physician). Drs. Rosales and Medrano were members of the hospital team which made the recommendation to Dr. Getz to discharge Bradley. Initially the team tentatively decided Bradley should be transferred to an Oregon mental hospital. This plan would have necessitated he be flown to Oregon at the expense of the State of Kansas and be accompanied on the trip by a Larned hospital staff member. Such arrangement would be subject to the approval of the Division of Institutional Management in Topeka. Dr. Artiles, hospital clinical director, sent a note to a member of the hospital team opposing the transfer plan. Subsequently, the recommendation was made simply to discharge Bradley.

The case was tried to a jury which returned a verdict in favor of the plaintiffs in the amount of $92,300. After deducting the Keeley settlement, judgment was entered against Drs. Artiles, Rosales and Medrano in the amount of $67,300. These three defendants then appealed to the United States Court of Appeals for the Tenth Circuit. Numerous issues have been raised in the appeal. Two questions of law have been certified by the federal appellate court to this court as being substantially determinative of the appeal and entirely subject to Kansas law. We have accepted the certification.

We turn now to the first question of law certified to this court for determination. For convenience the question is repeated.

WOULD THE KANSAS SUPREME COURT RECOGNIZE AS A VALID CAUSE OF ACTION A CLAIM WHICH GREW OUT OF A NEGLIGENT RELEASE OF A PATIENT WHO HAD VIOLENT PROPENSITIES, FROM A STATE INSTITUTION, AS DISTINGUISHED FROM NEGLIGENT FAILURE TO WARN PERSONS WHO MIGHT BE INJURED BY THE PATIENT AS THE RESULT OF THE RELEASE?

Preliminarily, some fundamental principles of the law of negligence need to be stated.

Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs. Further, if recovery is to be had for such negligence, the injured party must show: (1) a causal connection between the duty breached and the injury received; and (2) he or she was damaged by the negligence. See *Marks v. St. Francis Hospital & School of Nursing*, 179 Kan. 268, 270-71, 294 P.2d 258 (1956). An accident which is not reasonable to be foreseen by the exercise of reasonable care and prudence is not sufficient grounds for a negligence action. *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 780, 66 S.E.2d 441 (1951); and Carrington, *Victim's Rights Litigation: A Wave of the Future?*, 11 U. Rich. L. Rev. 447, 461 (1977). In Kansas it is a fundamental rule actionable negligence must be based on a breach of duty. *Hanna v. Huer, Johns, Neel, Rivers & Webb*, 233 Kan. 206, 221, 662 P.2d 243 (1983). See also *Robertson v. City of Topeka*, 231 Kan. 358, 363, 644 P.2d 458 (1982); and *Madison v. Key Work Clothes*, 182 Kan. 186, 192, 318 P.2d 991 (1957). *Robertson v. City of Topeka*, 231 Kan. 358, recognized a special relationship between certain persons could give rise to a duty. Whether a duty exists is a question of law, *McIntosh v. Milano*, 168 N.J. Super. 466, 495, 403 A.2d 500 (1979); *Chesapeake & Pot. Tel. Co. v. Bullock*, 182 Va. 440, 445, 29 S.E.2d 228 (1944); *Tort Law—Duty to Warn—Psychiatrist's Duty to Warn Parties of Dangerous Patients*, 19 Duq. L. Rev. 181, 185 (1980); and Carrington, 11 U. Rich. L. Rev. at 461. Whether the duty has been breached is a question of fact. *Chesapeake & Pot. Tel. Co. v. Bullock*, 182 Va. at 445. Further, whether there is a causal connection between the breached duty and the injuries sustained is also a question of fact. *Stucky v. Johnson*, 213 Kan. 738, 739, 518 P.2d 937 (1974).

In Kansas negligence is never presumed. *Blackmore v. Auer*, 187 Kan. 434, 440, 357 P.2d 765 (1960). This court in *Blackmore* commented it may be said negligence is the failure to observe, for the protection of the interests of another person, that degree of care, precaution and vigilance which the circumstances justly demand, as a result of which such other person suffers injury. 187 Kan. at 440. Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. In every instance, before an act is said to be negligent, there must exist a duty to the individual complaining, the observance of

which would have averted or avoided the injury. The plaintiff who sues his fellow man sues for a breach of duty owing to himself. 187 Kan. at 440. An act is wrongful, or negligent, only if the eye of vigilance, sometimes referred to as the prudent person, perceives the risk of damage. The risk to be perceived defines the duty to be obeyed, and *risk imports relation;* it is risk to another or to others within the range of apprehension. *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), 59 A.L.R. 1253. The existence of negligence in each case must depend upon the particular circumstances which surrounded the parties at the time and place of the occurrence on which the controversy is based. 187 Kan. at 441.

At the center of negligence is the concept of the reasonable person. What would a reasonable and prudent person, confronted by like circumstances and exercising reasonable care, have done? In other words, negligence involves acting other than as a reasonable person would do in the circumstances. The reasonable person has been observed to be the epitome of ordinariness, never reckless or absent-minded, yet neither endowed with exceptional courage, foresight or skill. Mellor, The Law, p. 53 (3rd ed. 1966).

The particular area of the law of negligence with which we are concerned herein is that of medical malpractice. Negligence is an essential element of a medical malpractice action. *Natanson v. Kline,* 187 Kan. 186, 354 P.2d 670 (1960). In *Malone v. University of Kansas Medical Center,* 220 Kan. 371, 552 P.2d 885 (1976), we summarized the duties of physicians and hospitals as follows:

"In *Tefft v. Wilcox,* 6 Kan. 46, 61, this court held that a physician is obligated to his patient under the law to use reasonable and ordinary care and diligence in the treatment of cases he undertakes, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians in the same or similar locations. We have continued to impose those duties upon physicians. See PIK, Civil, 15.01 and cases there cited. A physician also has the duty to make a reasonable disclosure to the patient of pertinent facts within his knowledge relating to proposed treatment, in order that the patient may intelligently consent to or refuse the treatment. [Citation omitted.]

"Hospitals owe a duty to their patients to exercise reasonable care. This is such care, skill and diligence as the known physical and mental condition of the patient may require, and it is that degree of care used by other hospitals in the

community or similar communities under like circumstances. See PIK, Civil, 15.02, and cases therein cited." 220 Kan. at 375.

In *Chandler v. Neosho Memorial Hospital*, 223 Kan. 1, 574 P.2d 136 (1977), this court said:

"A physician or surgeon is expected to have and to exercise that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices, or similar communities; similarly, a hospital is required to exercise that degree of care, skill and diligence used by hospitals generally in the community or in similar communities under like circumstances. *Avey v. St. Francis Hospital & School of Nursing*, 201 Kan. 687, 442 P.2d 1013, and cases cited therein." 223 Kan. at 3.

See also PIK Civ. 2d 15.01. It should be noted a physician is not a guarantor of good results and civil liability does not arise merely from bad results, nor if bad results are due to some cause other than his treatment. *Voss v. Bridwell*, 188 Kan. 643, 364 P.2d 955 (1961); *Goheen v. Graber*, 181 Kan. 107, 309 P.2d 636 (1957).

Rules of law governing the duty of physicians and surgeons to their patients apply generally to dentists (*Simpson v. Davis*, 219 Kan. 584, 549 P.2d 950 [1976]), and to registered nurses (*Hiatt v. Groce*, 215 Kan. 14, 523 P.2d 320 [1974]). The duty of a physician to exercise reasonable and ordinary care and diligence remains the same regardless of the particular medical speciality in which the physician practices. However, the particular decisions and acts required of the physician in fulfilling the duty will vary with the circumstances of the patient's situation and the medical specialty of the physician. Obviously such diverse medical specialties as dermatology, radiology, pediatrics, surgery, and psychiatry confront the professional practitioner of each with radically different medical problems. However, what constitutes negligence in a particular situation is judged by the professional standards of the particular area of medicine with which the practitioner is involved.

The appellants herein are a psychiatrist and two physicians who were involved in the professional recommendation of the hospital team to discharge Bradley Durflinger on the basis he was no longer in need of care or treatment. They argue, in essence, they and others like them should be insulated from civil liability for their acts, even if negligent, on the basis prediction of dangerousness of a mental patient is too difficult to make and, further, to hold otherwise: (1) would seriously cripple their ability to function professionally, and (2) would have a cata-

strophic effect on the civil rights of mentally ill persons. We do not agree.

In *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976), 83 A.L.R.3d 1166, similar arguments were raised and rejected. Although *Tarasoff* involved claimed liability for failure to warn rather than for negligent release (the distinction between the two theories to be discussed later), the following rationale of the California court applies with equal force to the therapist's duty in negligent release cases:

"The role of the psychiatrist, who is indeed a practitioner of medicine, and that of the psychologist who performs an allied function, are like that of the physician who must conform to the standards of the profession and who must often make diagnoses and predictions based upon such evaluations. Thus the judgment of the therapist in diagnosing emotional disorders and in predicting whether a patient presents a serious danger of violence is comparable to the judgment which doctors and professionals must regularly render under accepted rules of responsibility." 17 Cal.3d at 438.

Continuing:

"We recognize the difficulty that a therapist encounters in attempting to forecast whether a patient presents a serious danger of violence. Obviously, *we do not require that the therapist, in making that determination, render a perfect performance; the therapist need only exercise 'that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional speciality] under similar circumstances.'* (Bardessono v. Michels (1970) 3 Cal.3d 780, 788 [91 Cal. Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]; Quintal v. Laurel Grove Hospital (1964) 62 Cal.2d 154, 159-60 [41 Cal. Rptr. 577, 397 P.2d 161]; see 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 514 and cases cited.) Within the broad range of reasonable practice and treatment in which professional opinion and judgment may differ, the therapist is free to exercise his or her own best judgment without liability; proof, aided by hindsight, that he or she judged wrongly is insufficient to establish negligence." 17 Cal.3d at 438. (Emphasis supplied.)

Liability predicated upon negligent release of a patient committed to a mental hospital is a medical malpractice action. Bradley Durflinger was committed by the Reno County Probate Court to the Larned State Hospital upon the finding he was a mentally ill person in need of care or treatment. The statute in effect at the time of the commitment defining "mentally ill person" was K.S.A. 1973 Supp. 59-2902 which provided, in pertinent part:

"(1) The term 'mentally ill person' shall mean any person who is mentally

impaired, except by reason of mental deficiency only, to the extent that he is in need of 'care or treatment' and *who is or probably will become dangerous to himself or the person or property of others* if not given 'care and treatment' and

"(A) who lacks sufficient understanding or capacity to make responsible decisions with respect to his need for 'care or treatment', or

"(B) who refused to seek 'care or treatment' . . . ." (Emphasis supplied.)

The petition for commitment alleged Bradley was dangerous to himself or others. The petition was filed by his grandfather the day after Bradley had attempted to kill his grandparents. Clearly he was committed to the hospital because he was dangerous to other persons. The hospital was required to provide care or treatment for Bradley. The "head of the hospital" was required to discharge Bradley when he was "no longer in need of 'care and treatment' " (K.S.A. 1973 Supp. 59-2924), *i.e.,* no longer dangerous to himself or *others.* The three defendant-physicians were involved in the hospital team recommendation to the head of the hospital (hospital superintendent) that Bradley was no longer in need of care or treatment, *i.e.* no longer dangerous to himself or others. The making of the recommendation by the physicians to discharge or retain Bradley as a patient was a basic part of their professional employment. This professional duty obviously was for the benefit of Bradley and the public. We find no rational basis for insulating this one aspect of professional service from liability for negligence occurring in the performance thereof. The aforementioned standards for medical malpractice actions are applicable to an action for negligent release of a patient from a mental hospital. In *Davis v. Lhim,* 124 Mich. App. 291, 335 N.W.2d 481 (1983), the Michigan Court of Appeals held:

"All psychiatrists, whether employed by a state institution or private facility, are subject to a duty to exercise competent, professional judgment in all aspects of treatment of their patients, including the decision to discharge a patient from custodial care." 124 Mich. App. at 297.

Having reached this conclusion, we could end the discussion. However, we believe it is appropriate to distinguish negligent release from certain other types of third-party actions against physicians for damages done by their mental patients. In these other actions liability is not predicated upon the inherent duty of the physician in the ordinary course of treatment of his patient, but rather that a special relationship existed which required the physician to take some *affirmative* action outside the regular

course of treatment to protect third persons. Such affirmative actions are for the benefit of third parties, not the patient, and involve such steps as notifying a potential victim, calling the police or instituting commitment proceedings.

In *Tarasoff*, 17 Cal.3d 425, the therapist had knowledge an office patient was dangerous to a readily identifiable third person. He did not warn the third person and the patient murdered her. The California court held the therapist had an affirmative duty to warn the victim, call the police, or take other appropriate action for the victim's protection.

*Lipari v. Sears, Roebuck & Co.*, 497 F. Supp. 185 (D. Neb. 1980), involved a situation where a mental patient had been committed to a mental hospital and had been receiving psychiatric care from the Veterans Administration. The patient purchased a shotgun and resumed psychiatric *day care* treatment from the V.A. for about a month. The patient then stopped the treatment and a month later walked into a nightclub and shot Dennis Lipari to death and seriously wounded Ruth Ann Lipari. The United States was made a party to the action on the basis of negligent failure to detain the patient by seeking commitment. Here again, the duty imposed required the taking of an affirmative action for the protection of a third party, said action not being a part of the already accepted care and treatment of a committed patient such as in the case before us. In order to impose a duty to take affirmative action for the protection of third persons, the courts in both *Tarasoff* and *Lipari* adopted the Restatement (Second) of Torts § 315 (1965) and found a special relationship existed which required action to be taken for the benefit of a third person.

The opinion in *Lipari* discusses in depth the *Tarasoff* decision as well as adding its own rationale. The opinion further discusses a number of policy considerations also asserted by appellants herein. The relevant portion of the *Lipari* opinion is set forth in full as follows:

"This Court must therefore determine whether Nebraska law would impose a duty on a psychotherapist to take reasonable precautions to protect potential victims of his patient, when the psychotherapist knows or should know that his patient presents a danger to others.

"Unfortunately, the Nebraska Supreme Court has never addressed the issue of a therapist's duty to third persons. It therefore becomes the duty of this Court to ascertain what rule of law the Nebraska Supreme Court would adopt in this

situation. In making this determination, the Court will consider any Nebraska authority dealing with issues analogous to those raised in this case. The Court will also consider the case law of other jurisdictions, to the extent that it suggests the rule of law which the Nebraska Supreme Court would be likely to adopt. *See Hoesing v. Sears, Roebuck & Co.,* 484 F. Supp. 478, 478-79 (D. Neb. 1980).

"An essential element in any negligence action is the existence of a legal duty which the defendant owes to the plaintiff. *Daniels v. Andersen,* 195 Neb. 95, 98, 237 N.W.2d 397, 400 (1975). Under the common law, a person had no duty to prevent a third party from causing physical injury to another. A number of courts, however, have recognized an exception to this general rule. Under this exception, a person has a duty to control the conduct of a third person and thereby to prevent physical harm to another if

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315 (1965). *See, e.g., Seibel v. City & County of Honolulu,* Haw., 602 P.2d 532, 536 (1979). Since there is clearly no relationship between the V.A. and the persons injured by Mr. Cribbs [patient], the Court will limit its analysis to a discussion of the relationship between Mr. Cribbs and his doctors at the V.A.

"Under the Restatement approach, the psychotherapist-patient relationship has been found to be a sufficient basis for imposing an affirmative duty on the therapist for the benefit of third persons. *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976); *McIntosh v. Milano,* 168 N.J. Super. 466, 403 A.2d 500 (1979). Although the cases recognizing this duty are from jurisdictions other than Nebraska, this Court may be guided by these decisions since they provide a 'just and reasoned' analysis of the issues raised in the instant case. *See Seedkem v. Safranek,* 466 F. Supp. 340, 343 (D. Neb. 1979). The Court will therefore discuss these decisions in some detail.

"In *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976), the plaintiffs' complaint alleged that the defendant therapists had a duty to warn their daughter of the danger posed to her by one of the therapist's patients. The California Supreme Court's analysis of whether the complaint stated a cause of action began with recognition of the general rule that one person owes no duty to control the acts of another. However, the court then adopted the Restatement's special relationship exception to this rule. Applying this exception to the facts before it, the court held that the relationship between the patient and her therapist was sufficient to support the imposition of an affirmative duty on the defendant for the benefit of third persons. *Id.* at 435, 551 P.2d at 343, 131 Cal. Rptr. at 23. This duty existed even though the defendant therapists did not stand in a special relationship to both the injured party and the person whose conduct created the risk. *Id.* at 436, 551 P.2d at 344, 131 Cal. Rptr. at 24.

"In support of recognition of this duty, the court noted that in other settings, courts had found doctors and hospitals responsible for the behavior of their patients. Among the cases cited by the *Tarasoff* court were decisions in which the courts had recognized that a mental hospital may be liable for the negligent

release of dangerous patients. *Id.* at 436 n. 7, 551 P.2d at 343 n. 7, 344, 131 Cal. Rptr. at 23 n. 7, and in which the courts had held that a doctor was liable for his negligence to those contracting a contagious disease from his patient. *Id.* at 436, 551 P.2d at 344, 131 Cal. Rptr. at 24.

"In *McIntosh v. Milano*, 168 N.J. Super. 466, 403 A.2d 500 (1979), the New Jersey Superior Court was faced with the issue of whether a psychiatrist had a duty to warn a potential victim of one of his patients of the danger posed by that patient. The *McIntosh* court adopted the Restatement rule that a defendant has no duty to control the actions of another unless a special relationship had existed between the defendant and either the potential victim or the person whose conduct had created the risk. *Id.* at 483, 403 A.2d at 508-09. In analyzing the issue of whether the psychiatrist-patient relationship would support the creation of such a duty, the court noted that there were other factual settings in which the physician-patient relationship gave rise to an affirmative duty on the medical professions.

" '[T]he concept of legal duties for the medical profession is not new. A doctor-patient relationship in some circumstances admittedly places a duty to warn others of contagious diseases. New Jersey recognizes the general rule that a person who negligently exposes another to a contagious disease, which the other contracts, is liable in damages. . . . Specifically, a physician has the duty to warn third persons against the possible exposure to contagious diseases, e.g., tuberculosis, venereal diseases, and so forth. . . . That duty extends to instances where the physician should have known of the infectious disease.

" 'Physicians also must report tuberculosis, venereal disease and various other contagious diseases, *see e.g.,* N.J.S.A. 26:4-15, as well as certain other conditions.' Id. at 484, 403 A.2d at 509.

Based on these previously recognized duties, the *McIntosh* court concluded that the psychiatrist had an affirmative duty to take reasonable precautions to protect potential victims of his patients. In the *McIntosh* court's opinion, 'the relationship giving rise to this duty [could] be found either in that existing between the therapist and the patient, as was alluded to in *Tarasoff II,* or in the more broadly based obligation a practitioner may have to protect the welfare of the community, which is analogous to the obligation a physician has to warn third persons of infectious or contagious disease.' *Id.* at 490, 403 A.2d at 512.

"The *Tarasoff* and *McIntosh* decisions provide a well-reasoned framework for analyzing the issue of whether a psychotherapist owes an affirmative duty to persons other than his patient. This Court, however, must determine whether the Nebraska Supreme Court would adopt the *Tarasoff-McIntosh* analysis.

"The basis for the *Tarasoff-McIntosh* rule imposing an affirmative duty on psychotherapists was the courts' adoption of the special relationship analysis of the Restatement (Second) of Torts § 315. This Court is not aware of any Nebraska case expressly adopting the rule found in the Restatement § 315. However, there are two Nebraska cases which implicitly recognize the special relationship analysis. *See Daniels v. Andersen, supra,* 195 Neb. at 98, 237 N.W.2d at 400, *Rose v. Gisi,* 139 Neb. 593, 597-598, 298 N.W. 333, 336 (1941). In these cases, the Nebraska Supreme Court found a duty arising out of the defendant's relationship with the plaintiff, *Daniels v. Andersen, supra,* 195 Neb. at 98, 237 N.W.2d at 400,

or with the person creating the risk, *Rose v. Gisi, supra,* 139 Neb. 597-99, 298 N.W. at 336-37. The duty required that the defendant exercise reasonable care in controlling the action of a third person. In light of these Nebraska decisions recognizing an affirmative duty based on a special relationship, this court is of the opinion that the Nebraska Supreme Court would adopt the special relationship analysis found in Restatement § 315.

"Having determined that the special relationship rule is applicable to the instant case, the Court must next consider the issue of whether under Nebraska law the relationship between a psychotherapist and his patient is sufficient to justify imposition of an affirmative duty on the therapist to control the conduct of his patients. Although the Nebraska Supreme Court has never addressed this issue, this Court is of the opinion that the Nebraska court would find that the therapist-patient relationship gives rise to an affirmative duty for the benefit of third persons.

"The existence of this duty is suggested by a passage from a Nebraska case involving the physician-patient privilege. In *Simonsen v. Swenson,* 104 Neb. 224, 177 N.W. 831 (1920), the court held that a doctor was not liable to his patient for disclosing the patient's confidence, when the disclosure was necessary to prevent the spread of a contagious disease. This privilege was based on the fact that '[t]he doctor's duty does not necessarily end with the patient, for on the other hand, the malady of his patient may be such that a duty may be owing to the public and, in some cases, to other particular individuals.' *Simonsen v. Swenson, supra,* 104 Neb. at 227, 177 N.W. at 832. From this passage, it may be inferred that under Nebraska law the physician-patient relationship imposes affirmative duties on the physician for the benefit of persons other than the patient. This inference is buttressed by the fact that other jurisdictions have found that a physician owes a duty to persons who may be harmed by their patient's condition. *Freese v. Lemmon,* 210 N.W.2d 576 (Iowa 1973); *Kaiser v. Suburban Transportation System,* 65 Wash. 2d 461, 398 P.2d 14 (1965), *modified* 401 P.2d 350 (1965). *See Seibel v. City & County of Honolulu, supra,* 602 P.2d at 538.

"Despite this precedent imposing affirmative duties on physicians generally, the United States argues that various policy considerations counsel against the imposition of liability on psychotherapists. The primary thrust of the argument of the United States is that a therapist should not be held liable for the violent outbursts of his patients, because a therapist cannot accurately predict which patients pose a danger to other persons. To support this contention, the United States has submitted to the Court various studies which purport to prove that dangerousness cannot be predicted. The Court, however, is not persuaded that the inherent difficulties in predicting dangerousness justify denying the injured party relief regardless of the circumstances.

"The argument of the United States ignores the fact that psychiatrists and mental hospitals have been held liable for failing to predict the dangerous propensities of their patients. *See Hicks v. United States,* 511 F.2d 407, 415-17 (D.C. Cir. 1975); *Eanes v. United States,* 407 F.2d 823 (4th Cir. 1969); *White v. United States,* 317 F.2d 13, 17 (4th Cir. 1963); *Johnson v. United States,* 409 F. Supp. 1283, 1292-94 (M.D. Fla. 1976), *rev'd on other grounds* 576 F.2d 606 (5th Cir. 1978); *Greenberg v. Barbour,* 322 F. Supp. 745 (E.D. Pa. 1971); *Merchants National Bank & Trust Co. v. United States,* 272 F. Supp. 409, 417-19 (D.N.D.

1967); *Baker v. United States,* 226 F. Supp. 129, 132-35 (S.D. Ia. 1964), *aff'd* 343 F.2d 222 (8th Cir. 1965). Moreover, the Nebraska Supreme Court has imposed on hospitals a duty to guard against their patients' dangerous mental conditions when the condition is discoverable by the exercise of reasonable care. *Foley v. Bishop Clarkson Memorial Hospital,* 185 Neb. 89, 94-95, 173 N.W.2d 881, 884-85 (1970). *See Skar v. City of Lincoln, Neb.,* 599 F.2d 253, 258 n. 5 (8th Cir. 1979). These cases from Nebraska and other jurisdictions clearly show that the difficulty in predicting dangerousness has not caused the Nebraska Supreme Court or other courts to deny the existence of a cause of action for the negligence of the doctor or hospital.

"*The Court recognizes that it may be difficult for medical professionals to predict whether a particular mental patient may pose a danger to himself or others. This factor alone, however, does not justify barring recovery in all situations. The standard of care for health professionals adequately takes into account the difficult nature of the problem facing psychotherapists.*

 " 'Generalizations must be avoided as much as possible in psychiatry. Negligence cannot be imputed to the Hospital merely because of a mistake. A claim of negligence must be considered in light of the elusive qualities of mental disorders and the difficulty of analyzing and evaluating them. Exactitude is often impossible. The Supreme Court has recently noted " ' "the uncertainty of diagnosis in this field and the tentativeness of professional judgment." ' *Greenwood v. United States,* 350 U.S. 366, 375, 76 S.Ct. 410, 100 L.Ed. 412 (1956).' " *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Error and uncertainty considered alone must often be accepted without labeling them negligence.

.  .  .  .

The standard to be applied, however, must take into consideration the uncertainty which accompanies psychiatric analysis. In that area, as we have suggested, negligence may not ordinarily be found short of serious error or mistake, and not necessarily when the error or mistake is serious. The concept of "due care" in appraising psychiatric problems, assuming proper procedures are followed, must take account of the difficulty often inevitable in definitive diagnosis.' *Hicks v. United States, supra,* 511 F.2d at 415, 417. *See Tarasoff v. The Regents of the University of California, supra,* 17 Cal.3d at 436-37, 551 P.2d at 344-45, 131 Cal. Rptr. at 24-25; *McIntosh v. Milano,* 168 N.J. Super. at 481-83, 403 A.2d at 507-08. *Under this standard, a therapist who uses the proper psychiatric procedures is not negligent even if his diagnosis may have been incorrect. Given this protection, the Court is of the opinion that the difficulty in predicting dangerousness does not justify denying recovery in all cases.*

"A second policy argument raised by the United States involves the goal of placing mental patients in the least restrictive environment. The United States contends that imposing liability on a psychotherapist would conflict with this goal because therapists would attempt to protect themselves from liability by placing their patients in a restrictive environment. This argument misinterprets the nature of the duty imposed upon the therapist. The recognition of this duty does not make the psychotherapist liable for any harm caused by his patient, but

rather makes him liable only when his negligent treatment of the patient caused the injury in question.

" 'Modern psychiatry has recognized the importance of making every reasonable effort to return a patient to an active and productive life. Thus, the patient is encouraged to develop his self-confidence by adjusting to the demands of everyday existence. In this view, mental hospitals are not seen as dumping grounds for all persons whose behavior society might find inconvenient or offensive; institutionalization is the exception, not the rule, and is called for only when a paramount therapeutic interest or the protection of society leaves no choice. . . . [M]odern psychiatric practice does not require a patient to be isolated from normal human activities until every possible danger has passed. Because of the virtual impossibility of predicting dangerousness, such an approach would necessarily lead to prolonged incarceration for many patients who could become useful members of society. It has also been made clear to the Court that constant supervision and restriction will often tend to promote the very disorders they are designed to control. . . . On the other hand, despite the therapeutic benefits of this 'open door' approach, the practice admittedly entails a higher potential of danger both for the patient and for those with whom he comes in contact. *In deciding the extent to which a patient should be released from restrictions, the treating physician must exercise his judgment and balance the various therapeutic considerations together with the possible dangers.' Johnson v. United States, supra,* 409 F. Supp. at 1293.

*See Eanes v. United States, supra,* 407 F.2d at 824. Thus, despite the defendant's protests to the contrary, a psychotherapist is not subject to liability for placing his patient in a less restrictive environment, so long as he uses due care in assessing the risks of such a placement. This duty is no greater than the duty already owing to the patient.

"The United States' final challenge to recognition of a therapist's duty to protect third persons concerns the nature of the protection owed. The United States contends that assuming a therapist owes a duty to third persons, this duty is limited to warning potential victims of his patient's dangerous propensities. This contention is based on the holding in *Tarasoff.*

"Although the *Tarasoff* decision concerned only the issue of a therapist's duty to warn, the language of the case makes clear that the nature of the precautions which must be taken depends on the circumstances.

" 'When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.

. . . .

While the discharge of this duty of due care will necessarily vary with the facts of each case, in each instance the adequacy of the therapist's conduct must be measured against the traditional negligence standard of the rendition of reasonable care under the circumstances.' *Tarasoff v. The Regents of the*

*University of California, supra,* 17 Cal.3d at 430-39, 551 P.2d at 340, 345, 131 Cal. Rptr. at 20-25.

The Court is of the opinion that the approach suggested by this passage from *Tarasoff* is appropriate. *It is not unfair to require the psychotherapist to take those precautions which would be taken by a reasonable therapist under similar circumstances.* Moreover, this Court refuses to rule as a matter of law that a reasonable therapist would never be required to take precautions other than warnings, or that there is never a duty to attempt to detain a patient. These issues can only be determined after the parties have had an opportunity to prove what precautions a reasonable psychotherapist would take under the circumstances in issue there.

*"To summarize, this Court is of the opinion that under Nebraska law the relationship between a psychotherapist and his patient gives rise to an affirmative duty for the benefit of third persons. This duty requires that the therapist initiate whatever precautions are reasonably necessary to protect potential victims of his patient. This duty arises only when, in accordance with the standards of his profession, the therapist knows or should know that his patient's dangerous propensities present an unreasonable risk of harm to others."* 497 F. Supp. at 188-93. (Emphasis supplied.)

Although this court has never formally adopted Restatement (Second) of Torts § 315 (1965), commented on in *Lipari,* we discussed the concept of special relationship in *Robertson v. City of Topeka,* 231 Kan. 358, 644 P.2d 458 (1982). In *Robertson* we held a police officer was not liable for the acts of an intoxicated person absent some special relationship with or specific duty owed the party injured by the intoxicated person's acts. 231 Kan. at 363. We observed a special relationship or specific duty has been found when one creates a foreseeable peril, not readily discoverable, and fails to warn. 231 Kan. at 364.

In actions where liability is predicated on negligent release of a patient from a mental hospital, general rules of negligence and medical malpractice control and there is no reason to apply the concept of special relationship and the resulting affirmative duty to take some special step to protect a third party or the public. We are not called upon in this case to decide whether, in Kansas, liability may be predicated upon a therapist's failure to warn a victim or failure to detain based upon a special relationship and, accordingly, decline to decide such issues in this opinion.

The answer to the first certified question is *"Yes"* based on the foregoing rationale. We recognize as a valid cause of action, a claim which grew out of a negligent release of a patient who had violent propensities, from a state institution, as distinguished from negligent failure to warn persons who might be injured by

the patient as the result of the release. In answering the question presented, we are only concerned with *whether a duty exists* in such circumstance and if so, what the duty is. We have concluded the duty exists and it is encompassed in the general duties of physicians and surgeons. Whether or not a breach of that duty occurred under the particular facts herein is outside the scope of the question of law presented to us for determination.

The second certified question of law is:

DO STAFF DOCTORS, AS DISTINGUISHED FROM THE SUPERINTENDENT OR HEAD OF THE HOSPITAL OR INSTITUTION, HAVE LEGAL IMMUNITY UNDER KANSAS LAW, FROM CIVIL LIABILITY RESULTING FROM A RELEASE OR FAILURE TO WARN OF THE RELEASE OF A DANGEROUS PATIENT?

As will be recalled the first certified question spoke of "negligent release of a patient" as distinguished from "negligent failure to warn." Literally in the second question we are being asked to decide the immunity issue as to both negligent release and failure to warn theories of liability. We do not believe however that such literal reading of the question is intended. There is no claim in the case before us predicated upon failure to warn. Further, the immunity issue is not dependent upon which theory liability is predicated. Finally, the certifying court (United States Court of Appeals, Tenth Circuit) has in its certification summarized its own questions as follows:

"The principal issues are those which are set forth above, namely, whether the Kansas Supreme Court would recognize as a valid cause of action a claim for negligent release of a patient from a state hospital or institution, in the context of the facts of this case. And secondly, whether the staff doctors, as distinguished from the hospital, have an immunity similar to that which the trial court applied to the superintendent."

We therefore will consider the question as relating solely to negligent release in the context of the facts of this case.

The cause of action herein arose before the 1979 enactment of the Kansas Tort Claims Act (K.S.A. 1982 Supp. 75-6101 *et seq.*) and accordingly, any discussion of the act would be inappropriate in determining this question.

K.S.A. 46-901 (Weeks) was the governmental immunity statute in effect at the pertinent time herein (1974). The statute provided:

"(a) It is hereby declared and provided that the following shall be immune from liability and suit on an implied contract, or for negligence or any other tort, except as is otherwise specifically provided by statute:

"(1) The state of Kansas; and

"(2) boards, commissions, departments, agencies, bureaus and institutions of the state of Kansas; and

"(3) all committees, assemblies, groups, by whatever designation, authorized by constitution or statute to act on behalf of or for the state of Kansas.

"(b) The immunities established by this section shall apply to all the members of the classes described, whether the same are in existence on the effective date of this act or become members of any such class after the effective date of this act."

In *Kern v. Miller,* 216 Kan. 724, Syl. ¶ 2, 533 P.2d 1244 (1975), K.S.A. 46-901 (Weeks) was construed as follows:

"The immunity granted by K.S.A. 46-901(a) is limited to claims against the State of Kansas and its boards, commissions, departments, agencies, bureaus and institutions; and all committees, assemblies and groups authorized to act on behalf of the state. *The words 'members of the classes described,'* appearing in subsection (b) of the statute, *are interpreted to mean* the *various boards, commissions, etc., which make up the classes described in subsection (a), and not the individuals composing the several classes.*" (Emphasis supplied.)

The defendant-physicians herein, accordingly have no statutory immunity under K.S.A. 46-901 (Weeks).

In *Kern* the following general rule was stated:

"Public officers, when performing the duties imposed upon them by statute and exercising in good faith the judgment and discretion necessary therefor, are not liable personally in damages for injuries to private individuals resulting as a consequence of their official acts. If public officers act outside the scope of their authority they may be held liable for damages resulting from their acts." 216 Kan. 724. Syl. ¶ 3.

Public employees as opposed to public officers have no such immunity. The key issue involved in this question is whether staff doctors at a state mental institution are public officers or public employees.

As stated in *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P.2d 934 (1954), a case involving failure to restrain a suicidal patient:

"It is a general principle that for negligent or tortious conduct, liability is the rule. Immunity is the exception to the rule, created by the courts which have applied it. The law's emphasis is ordinarily on liability, not immunity for wrongdoing." 175 Kan. at 762.

See also *Noel v. Menninger Foundation,* 180 Kan. 23, 299 P.2d 38 (1956). In *Rose v. Board of Education,* 184 Kan. 486, 337 P.2d

652 (1959), a defendant school custodian contended he was immune from liability for his negligent acts on the basis he was a public officer. In rejecting this claim, we stated:

"In principle as well as in logic, we think that sound public policy requires that a public employee be held accountable for his negligent acts to those who suffer injury by reason of his misconduct, even though he is about the business of his employer (such as here, the school board) which is immune from tort liability under the governmental function doctrine. In other words, the official cloak of immunity should not extend to the negligent employee so as to shield him from answering for his wrongful act by which another has suffered injury." 184 Kan. at 491.

In *Sowers v. Wells*, 150 Kan. 630, 95 P.2d 281 (1939), this court was asked what is a "public office" and who is a "public officer"? 150 Kan. at 633. In response the court answered:

"While the authorities are not in complete harmony in defining the term 'public office,' or 'public officer,' it universally has been held that the right to exercise some definite portion of sovereign power constitutes an indispensable attribute of 'public office.' " 150 Kan. at 633.

See also *Steere v. Cupp,* 226 Kan. 566, 572 , 602 P.2d 1267 (1979). Two years before *Sowers,* this court in *Miller v. Ottawa County Comm'rs,* 146 Kan. 481, 71 P.2d 875 (1937), stated:

"The distinction between an officer and an employee is that the responsibility for results is upon one and not upon the other. There is also upon an officer the power of direction, supervision and control. The distinction between a public officer and an employee is concisely made in 22 R.C.L. 379, in the following language:

" 'A public office is not the same thing as a contract, and one contracting with the government is in no just and proper sense an officer of the government. The converse is likewise true and an appointment or election to a public office does not establish a contract relation between the person appointed or elected and the public.'

. . . .
"In 53 A.L.R. 595 it is stated:

" 'It may be stated, as a general rule deducible from the cases discussing the question, that a position is a public office when it is created by law, with duties cast on the incumbent which involve an exercise of some portion of the sovereign power and in the performance of which the public is concerned, and which also are continuing in their nature and not occasional or intermittent; while a public employment, on the other hand, is a position which lacks one or more of the foregoing elements.' (See, also, 93 A.L.R. 332.)" 146 Kan. at 484-85. (Emphasis supplied.)

See also 63 Am. Jur. 2d, Public Officers and Employees § 11, p. 634, and generally §§ 1-14; Annot., Distinction between Office

and Employment, 140 A.L.R. 1076; and 35 Words and Phrases, Public Officer, pp. 408-14 (1963).

In 63 Am. Jur. 2d, Public Officers and Employees § 1, at p. 625, it is commented:

"A public officer is such an officer as is required by law to be elected or appointed, who has a designation or title given him by law, and who exercises functions concerning the public, assigned to him by law. The duties of such officer do not arise out of contract or depend for their duration or extent upon the terms of a contract."

Black's Law Dictionary (5th ed. 1979), has defined public office and public official.

"**Public office.** Essential characteristics of 'public office' are (1) authority conferred by law, (2) fixed tenure of office, and (3) power to exercise some portion of sovereign functions of government; key element of such test is that 'officer' is carrying out sovereign function. Spring v. Constantino, 168 Conn. 563, [568-69,] 362 A.2d 871, 875 [(1975)]. Essential elements to establish public position as 'public office' are: position must be created by constitution, legislature, or through authority conferred by legislature, portion of sovereign power of government must be delegated to position, duties and powers must be defined, directly or impliedly, by legislature or through legislative authority, duties must be performed independently without control of superior power other than law, and position must have some permanency and continuity. State v. Taylor, 260 Iowa 634, [639,] 144 N.W.2d 289, 292 [(1966)]." p. 1107.

"**Public official.** The holder of a public office though not all persons in public employment are public officials because public official's position requires the exercise of some portion of the sovereign power, whether great or small. Town of Arlington v. Bds. of Conciliation and Arbitration, [370 Mass. 769], 352 N.E.2d 914 [(1976)]." p. 1107.

In the case before us Dr. G. W. Getz, superintendent of the Larned State Hospital was granted summary judgment by the trial court on the basis he was a public officer and hence immune from liability. The "Act for Obtaining Care and Treatment for a Mentally Ill Person" (K.S.A. 1973 Supp. 59-2901 *et seq.*) placed many duties upon Dr. Getz as the "head of the hospital." Among such duties were authority to discharge a mental patient no longer in need of care or treatment (K.S.A. 1973 Supp. 59-2924); discretionary authority to grant convalescent leave to a patient (K.S.A. 1973 Supp. 59-2924); and authority to command any peace officer or other person to take into custody a patient who was absent from the hospital without leave and to transport same back to the institution (K.S.A. 1973 Supp. 59-2926).

By contrast no similar grants of authority are given to staff

physicians who were part of the unclassified service under the Kansas Civil Service Act (K.S.A. 1973 Supp. 76-12a03). K.S.A. 1973 Supp. 76-12a03 provided any physician could be removed by the Director of Mental Health & Retardation Services. Further, the Director was empowered to make all assignments and reassignments of physicians to the institutions. The staff doctors were under the control and supervision of the head of the hospital, Dr. Getz, and the Director of Mental Health & Retardation Services. (K.S.A. 1973 Supp. 76-12a06.)

In *Jagger v. Green,* 90 Kan. 153, 133 Pac. 174 (1913), Mr. Jagger had been discharged from his position as a field man for the Kansas City health department on the rationale he was a public officer rather than a government employee and therefore not protected by civil service laws. Mr. Jagger brought an action in mandamus to compel the Board of Commissioners for Kansas City to recognize his position was subject to civil service. In holding for Mr. Jagger this court commented:

"The health commissioner is the only person connected with the department of public health who holds a position analogous to an office. The field men are merely subordinate employees who work under his direction and supervision and for whose conduct he is responsible. . . . [T]he field men possess no *other authority which rises to the dignity of corporate power officially vested. It* is not important that the ordinance uses the term 'officers' in one place in speaking of the appointees in the health department. Considering the nature of the service, its relative importance, its essentially subservient character, and the placing of responsibility for results upon a superior who is given full power of direction, supervision and control, it must be held that the plaintiff was not a city officer within the meaning of the statute just referred to.

"Since the plaintiff is not one of the appointive officers or employees excepted from the operation of the civil service act, he is entitled to claim the benefit of its provisions." 90 Kan. at 158.

In *Jones v. Botkin,* 92 Kan. 242, 139 Pac. 1196 (1914), a nurse-cell attendant at the state hospital for the criminally insane, was fired by a warden. The warden argued Jones was a public officer serving at the warden's pleasure. This court held Jones was a public employee of the institution and accordingly, protected by the civil service act.

Although a part of the criminal code, K.S.A. 21-3110 defines "public employee" and "public officer" and hence should be cited herein. K.S.A. 21-3110 provides in pertinent part:

"(18) 'Public employee' is a person employed by or acting for the state or by or for a county, municipality or other subdivision or governmental instrumentality

of the state for the purpose of exercising their respective powers and performing their respective duties, and who is not a 'public officer.'

"(19) 'Public officer' includes the following, whether elected or appointed:

"(a) An executive or administrative officer of the state, or a county, municipality or other subdivision or governmental instrumentality of or within the state.

"(b) A member of the legislature or of a governing board of a county, municipality, or other subdivision of or within the state.

"(c) A judicial officer, which shall include a judge of the district court, juror, master or any other person appointed by a judge or court to hear or determine a cause or controversy.

"(d) A hearing officer, which shall include any person authorized by law or private agreement, to hear or determine a cause or controversy and who is not a judicial officer.

"(e) A law enforcement officer.

"(f) Any other person exercising the functions of a public officer under color of right."

Not only are these definitions in effect now but they were also in existence in April, 1974. K.S.A. 1973 Supp. 21-3110(18), (19).

Another set of statutory definitions in effect now and in 1974 is K.S.A. 75-4301 (K.S.A. 1973 Supp. 75-4301), which provides:

"*Public office.* A position of public trust or agency, created by the Kansas constitution, by statute, by executive decree or by an ordinance or resolution of a municipal or quasi-municipal corporation passed in pursuance of legislative authority.

"*Public officer.* Any person who holds public office in the state of Kansas, except that an attorney-at-law, acting only in his or her professional capacity, who holds no other public office shall not be construed to be a public officer for the purposes of this act, nor shall such term include any notary public or any person who holds an office in any political party and who holds no other public office.

"*Public employee.* Any employee of the state of Kansas or any municipal or quasi-municipal corporation, except that an attorney-at-law, acting only in his or her professional capacity, who holds no other public employment shall not be construed to be a public employee for the purposes of this act."

See also K.S.A. 75-4322(a) - (f) (K.S.A. 1973 Supp. 75-4322[a] - [f]).

We conclude the staff physicians of state mental hospitals are public employees rather than public officers and hence have no common law immunity.

Next defendant-physicians argue they have statutory immunity pursuant to K.S.A. 1973 Supp. 59-2932 which provides:

"Any person acting in good faith and *without negligence shall be free from all liability,* civil or criminal, which might arise out of acting pursuant to this act. Any person who for a corrupt consideration or advantage, or through malice, shall make or join in making or advise the making of any false application, report or

order provided for in this act shall be guilty of a misdemeanor, and punished by a fine of not more than one thousand dollars ($1,000) or by imprisonment in the county jail for not more than one (1) year." (Emphasis supplied.)

K.S.A. 1973 Supp. 59-2932 was a part of the "Act for Obtaining Care and Treatment for a Mentally Ill Person" in effect in 1974. The statute has not been amended substantively as have so many other sections of the act.

This argument is without merit. The immunity granted by K.S.A. 1973 Supp. 59-2932 is conditioned on the person claiming same having acted in good faith and *without negligence*. Clearly the statute does not grant immunity for negligent acts and hence is no shield to a cause of action predicated upon negligence.

We conclude the answer to the second certified question is "No." Staff doctors employed in a state institution, as opposed to the hospital superintendent, have no legal immunity from civil liability resulting from an allegedly negligent release of a mental patient in 1974.