**Corrine CASTILLO, as Administratrix of the Estate of Richard Montoya, Deceased, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 76–1279.**

United States Court of Appeals, Tenth Circuit.

Submitted Jan. 26, 1977.

Decided April 12, 1977.

Thomas L. Grisham, Albuquerque, N.M. (Stephen F. Lawless, Albuquerque, N.M., on the brief), of McCulloch, Grisham & Lawless, Albuquerque, N.M., for appellant.

James B. Grant, Asst. U. S. Atty., Albuquerque, N.M. (Victor R. Ortega, U. S. Atty., Albuquerque, N.M., on the brief), for appellee.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

Corrine Castillo, (Castillo), as Administratrix of the Estate of Richard Montoya, Deceased, appeals from a judgment in favor of the United States Government following trial to the court on a suit filed by Castillo pursuant to 28 U.S.C.A., §§ 1346(b) and 2671, commonly referred to as the Federal Tort Claims Act.

The action was filed following the death of Richard Montoya after his "elopement" from the Veterans Administration hospital psychiatric ward facilities located in Albuquerque, New Mexico.

Castillo alleges in her complaint that Montoya, who had voluntarily entered the hospital for psychiatric care and treatment, was permitted to depart from the facility undetected for a period in excess of three (3) hours, during which time he traveled to Belen, New Mexico, some 25 miles away, where he was run over by a train in the Belen train yard; that his death would not have occurred except for the negligence of the hospital staff in failing to "closely observe" Montoya's activities and promptly notifying his relatives of his departure as required by Veterans Administration's hospital regulations.

Richard Montoya was a voluntary patient hospitalized in the psychiatric ward of the Veterans Administration hospital located in Albuquerque, on some nine separate occasions between 1970 and the date of his death in October, 1972. In 1972 the hospital staff had diagnosed his condition as "chronic undifferentiated schizophrenia." During this two-year period of voluntary hospitalization, Montoya had exhibited episodes of bizarre behavior, i. e., physical aggression toward others, acute psychotic periods, and visual and auditory delusions. Even so, the hospital staff did not believe that he was dangerous to himself or others.

On each of his four admissions prior to his final admission on October 16, 1972, Montoya remained at the hospital for a short time and he departed without notifying the staff in advance despite the staff recommendation that he should continue treatment. The hospital refers to depar-

ture under these conditions as "elopement." When he "eloped" from the hospital, Montoya would either walk or take a cab to the home of one of his relatives in Belen, New Mexico, some 25 miles away.

On October 18, 1972, Montoya was last seen by the hospital staff at approximately 5:00 P.M., after which he eloped from the hospital. At about 7:30 P.M. that day he was seen approaching the engine of a train in the Santa Fe railroad yards near Belen. The brakeman on the train yelled at him, and Montoya then turned and started towards the rear of the train which was moving at about six to eight miles per hour. Shortly afterwards, he was run over by the train and killed.

The regulations which Castillo alleges to have been violated by the hospital staff are contained in a Veterans Administration Manual entitled "Standard Administrative Procedures for Psychiatric Services in Veterans Administration Hospitals." They are:

### SECTION XV. ELOPEMENTS

#### 84. DEFINITION OF ELOPEMENT

An elopement is the unauthorized absence of a psychiatric patient from hospital supervision.

#### 85. ACTION ON DAY OF PATIENT'S ELOPEMENT

a. *Action by Registrar.* On notification from the ward that a patient has eloped, the Registrar, or his designee, will:

(1) Notify the patient services clerk, patients control clerk, and Chief, Patients Effects Section.

(2) Notify the patient's guardian or nearest relative. The telegram and/or letter to the guardian or nearest relative will be prepared on instructions from the ward physician. It will be tactfully worded and will be forwarded over the signature of the Manager or Chief, Professional Services. The guardian or nearest relative will be informed of the action the hospital desires taken if the patient's whereabouts become known.

\* \* \* \* \* \*

### SECTION XX. SECURITY MEASURES

#### 205. RESPONSIBILITY AND PROCEDURES

a. *Responsibility for Security Measures.* A basic responsibility in the treatment of psychiatric patients is the protection of the patient and others from the effects of the patient's illness. All employees will maintain close observation of patients who have known or suspected suicidal, assaultive, convulsive, or elopement tendencies, and will report any such apparent tendencies promptly to the ward physician, ward nurse, or other professional personnel.

\* \* \* \* \* \*

The Manual was issued September 8, 1953. The regulations have not been changed since.

In addition to the trial court's knowledge and consideration of the aforementioned Veterans Administration hospital regulations and the background facts relating to Richard Montoya, as heretofore related in a conclusory manner, the trier of fact also considered the uncontroverted testimony of Dr. Glover, a staff psychiatrist at the Veterans Administration hospital Albuquerque, New Mexico. Dr. Glover testified, *inter alia* : that the hospital's psychiatric ward is operated under an "open door" policy, which today is a generally accepted psychiatric theory of treatment; that modern psychiatric therapy is predicated on the theory that treatment cannot be effectively forced on a patient and that the patient must be encouraged to seek and desire treatment. He further testified that to facilitate this mode of treatment, a patient is admitted on a voluntary basis, and, by the same token, he may leave the ward and hospital if he so desires, even though the staff may encourage him to remain for further care and treatment; that in line with the "open door" policy, the psychiatric ward has no guards, room checks, and no check-in or check-out procedures; that the patients are allowed to retain their own clothing, wallets, and valuables; and that the sole restraints employed involve use of specific medications, group pressure (primarily from fellow patients) and, if neces-

sary, to protect the patient from doing physical harm to himself or others, confinement in a single treatment room. Dr. Glover further testified that the regulations relied upon by Castillo were not generally followed to the letter, but were considered as guidelines and very old, somewhat outdated ones at that. He stated that psychiatric treatment and theory had advanced a great deal since 1953 when the regulations were promulgated, and that modern psychiatric therapy requires a flexibility not possible under strict adherence to the regulations. He said that only when a patient was dangerous to himself or others was "close observation" itself required.

The district court, following the hearing, found that Montoya's elopement was not the fault of the hospital; that the hospital staff was not negligent; that there was no causal connection between Montoya's elopement and death; and that the doctrine of negligence per se was not applicable. The court concluded that it was unable to state, based on a preponderance of the evidence, how Montoya got underneath the train or otherwise in a position in which he was run over; that it was equally possible that Montoya slipped and fell under the train, or that he deliberately threw himself beneath it. The court did find that Montoya was familiar with the railroad yards in Belen and the inherent dangers there, since he had apparently on prior occasions illegally boarded trains leaving the yards. It was the impression of the brakeman that Montoya was trying to step onto the train.

In cases involving tort claims, the law of the state where the act or omission complained of applies. 28 U.S.C.A., § 2674; *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In considering trial court findings and conclusions, we observe that an appellate court must accept the findings of fact (which Castillo apparently does not challenge) and conclusions of law of the trial court unless they are clearly erroneous. Fed.R.Civ.Proc., rule 52(a), 28 U.S.C.A.; *Four Sons Bakery, Inc. v. Dulman*, 542 F.2d 829 (10th Cir. 1976); *Ahern v. Veterans Administration*, 537 F.2d 1098

(10th Cir. 1976); *Sims Consolidated, Ltd. v. Irrigation and Power Equipment, Inc.*, 518 F.2d 413 (10th Cir. 1975), *cert. denied*, 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 141 (1975); *Permian Corporation v. Armco Steel Corporation*, 508 F.2d 68 (10th Cir. 1974); *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir. 1974); *Transwestern Pipeline Co. v. Kerr-McGee Corp.*, 492 F.2d 878 (10th Cir. 1974), *cert. dismissed*, 419 U.S. 1097, 95 S.Ct. 691, 42 L.Ed.2d 689 (1975).

On appeal, Castillo urges two grounds for reversal: (1) the district court's findings of fact require a judgment in favor of Castillo in that violation of Veterans Administration regulations constitutes negligence per se; (2) Castillo is entitled to a judgment as a matter of law since the court's findings of fact indicate the defendant was guilty of common law negligence.

## I.

Castillo urges that violation of an administrative regulation promulgated by the Administrator of the Veterans Administration constitutes negligence per se. In New Mexico, the required elements of such negligence have been specifically established:

> The test for negligence per se is the following: (1) there must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent. See *Fitzgerald v. Valdez*, 77 N.M. 769, 427 P.2d 655 (1967) (failure to put lamp near vehicle at night); *Sanchez v. J. Barron Rice, Inc.*, 77 N.M. 717, 427 P.2d 240 (1967) (failure to adjust furnace); *Hisaw v. Hendrix*, 54 N.M. 119, 215 P.2d 598 (1950) (failure to put flares out on road and failure to park off pavement); *Turrietta v. Wyche*, 54 N.M. 5, 212 P.2d 1041 (1949) (sideswiping); *Clay v. Texas-Arizona Motor Freight*, 49 N.M. 157, 159 P.2d

317 (1945) (speeding); *Dahl v. Turner*, 80 N.M. 564, 458 P.2d 816 (Ct.App.1969) (speeding); . . ..

*Archibeque v. Homrich*, 88 N.M. 527, 543 P.2d 820, 825 (1975).

*See also*: Prosser, Torts § 36 (4th Ed. 1971). The above test has been applied to ordinances. *Burran v. Dambold*, 422 F.2d 133 (10th Cir. 1970). And the test has also been applied to administrative/regulatory agency regulations. 28 U.S.C.A., § 2680(a).

█ Castillo places substantial reliance on *Werner v. City of Albuquerque*, 89 N.M. 272, 550 P.2d 284 (1976). In that case, Werner, an electrician, was denied recovery for injuries he sustained while testing an electrical switch box located at a municipal golf course. He asserted that because the electrical switch box was not marked with a high voltage warning as required by the state electrical code, his alleged contributory negligence was not a defense. The court held that Werner's contributory negligence, which had been concluded as a matter of law, was not barred as a defense simply because of the violation of the electrical code. Apparently predicated solely on the court's use of the word "regulation" in a portion of its opinion discussing the applicability of contributory negligence as a defense,[1] Castillo now urges that negligence per se is mandated by reason of the alleged violation of the hospital regulation. Such a step is beyond the measure of our judicial stride. The thrust of the *Werner* opinion concerns the applicability of contributory negligence as a defense; it does not even obliquely refer to negligence per se arising from the violation of regulations.

█ We observe, without deciding, that it is questionable whether the guide-lines involved here are "regulations." They are part of a lengthy and complex Veterans Administration Manual entitled "Standard Administrative Procedures for Psychiatric Services in VA Hospitals." As such, the guidelines, or regulations as Castillo delineates them, are but a portion of the specified procedures governing the *internal* management and coordination of psychiatric services provided by the Veterans Administration. Further, the relevant procedure here, No. 205 under Section XX. Security Measures, lists as a basic responsibility relative to the treatment of psychiatric patients the protection of the patient and others from the effects of the patient's illness. As such, it does not set the standard of conduct below which negligence per se occurs. The reasonable-man standard of conduct is dictated by regulation (or statute or ordinance) only when the hazard regulated against (promulgated for the protection of the plaintiff) has in fact caused the harm which occurred. 28 U.S.C.A., § 2680(a), *supra*; Restatement of Torts, Second § 286; 57 Am.Jur.2d, Negligence § 272 (1971); 65 C.J.S. Negligence § 19(1) (1966). When the harm involved results from a hazard other than the one legislated against, the regulatory standard does not relate to tortious causation. Restatement of Torts, Second § 288(g).

█ The regulatory procedure involved here (close observation) was designed for the protection of the patient and others from the effects of the patient's illness for internal operating purposes dealing with care and treatment. There was no causal link between the hazard regulated against and Montoya's death. Any failure on the part of the hospital staff to strictly follow

---

1. Contributory negligence is available as a defense in the normal action for negligence based on the violation of a statute. *Zamora v. J. Korber & Co.*, 59 N.M. 33, 278 P.2d 569 (1954); *Boatright v. Sclivia*, 421 F.2d 949 (10th Cir. 1970).

   An exception to the rule arises where the effect of the statute, ordinance or regulation is to place the entire responsibility upon the defendant for plaintiff's injury. Restatement of Torts (Second) § 483 (1965); 57 Am.Jur.2d Negligence § 308 (1971). This rule is applicable where the statute imposes *absolute liability* on defendant, *State ex rel. Dept. of Hwys. v. Ray I. Jones Serv. Co.*, 475 P.2d 139 (Okl.1970); *Rothfuss v. Hamilton Masonic Temple Co.*, 34 Ohio St.2d 176, 297 N.E.2d 105 (1973), or where the statute, like the Workmen's Compensation Act, expressly removes contributory negligence as a defense to an employer. . . . *Werner v. City of Albuquerque*, 89 N.M. 272, 550 P.2d 284, 286–287 (1976).

**1390**

the procedure is, at most, only some evidence of negligence, particularly when considered in the light of Dr. Glover's testimony that the procedures were out of step with contemporary psychiatric methods and are merely guidelines. Any violation of the procedures involved in the instant case was not negligence per se.

## II.

Quite possibly in anticipation of rejection of her negligence per se contention, Castillo further urges that the trial court's findings of fact require, as a matter of law, a judgment finding the United States guilty of common law negligence. In New Mexico, as is universally the case, liability in the area of negligence requires not only that the defendant be negligent, but that the negligence be a proximate cause of the injury complained of. *Lopez v. Maes*, 81 N.M. 693, 472 P.2d 658 (1970); Prosser, Torts § 41 (4th Ed. 1971). And "[p]roximate cause is that which, in a natural or continuous sequence, produces the injury and without which the injury would not have occurred. *Chavira v. Carnahan*, 77 N.M. 467, 423 P.2d 988 (1967); *Bouldin v. Sategna*, 71 N.M. 329, 378 P.2d 370 (1963); *Thompson v. Anderman*, 59 N.M. 400, 285 P.2d 507 (1955)." *Galvan v. City of Albuquerque*, 85 N.M. 42, 508 P.2d 1339, 1343 (1973). It need not be the last act nor the sole cause, but it must be a concurring cause. *Galvan, supra; Kelly v. Montoya*, 81 N.M. 591, 470 P.2d 563 (1970); *Ortega v. Texas-New Mexico Railway Company*, 70 N.M. 58, 370 P.2d 201 (1962). And the injury resulting from the alleged negligent act must be such that a reasonably prudent person would have anticipated it. *Reif v. Morrison*, 44 N.M. 201, 100 P.2d 229 (1940).

Assuming *arguendo* that the United States, through some purported negligence on the part of its employees at the Veterans Hospital in Albuquerque, breached a duty to "closely observe" the deceased, liability for his untimely death does not

necessarily follow. Montoya had been diagnosed as late as October, 1972, as neither dangerous to himself nor to others, a finding of the trial court which Castillo does not challenge. It is significant that it was Castillo who placed a call to the hospital on the evening of Montoya's death, approximately three hours after his "elopement" inquiring as to his whereabouts; when informed that he was not at the hospital, she notified the hospital staff that he had been run over and killed by a train in the Belen railroad yards. Castillo is Montoya's sister. Montoya had resided with her or other close relatives between hospital admissions for some time. It can certainly be reasonably inferred that Castillo was aware of the hospital policies and its methods of care and treatment. None of Montoya's prior elopements involved any identifiable criticism or challenge to the hospital authorities, and no official "commitment" of Montoya to the hospital had been undertaken. Under the totality of these circumstances, Montoya's death cannot have been the "natural consequence" of the negligence alleged here. Following each of Montoya's four voluntary admissions prior to that of October 16, 1972, Montoya "eloped" by either walking or taking a cab safely to his residence in Belen. The hospital staff had no cause to believe that Montoya's "elopement" on October 18, 1972, would result in his death when he was struck and killed by a train in Belen. We observe that even had the staff "closely observed" Montoya, such would not very likely have altered the sequence of events in view of the trial court finding that the hospital staff was without authority to restrain Montoya from leaving. His admission was voluntary and not by commitment. Under all of these circumstances, any failure of the staff to "closely observe" the deceased, even if considered negligence, could hardly be the "proximate cause" of his death.

Castillo has further relied heavily on a Texas decision which although similar in many respects to the case at bar, is not controlling. *Arlington Heights Sanitation*

*v. Deaderick*, 272 S.W. 497 (Tex.Civ.App. 1921). In that case the deceased, who was killed by a train, was found by the court to be incapable of caring for or protecting himself; furthermore, he had been committed to the hospital on a non-voluntary basis.

WE AFFIRM.