868 F.2d 372
 Karen L. HOKANSEN, fka Karen L. Neil; Cecile Lou Browning,
heir-at-law and next of kin of Aimee Uffner, deceased minor,
Cecile Lou Browning, Successor To Randall J. Price, Special
Administrator of the Estate of Aimee Uffner, deceased;
Amalia R. Zapata; and Amalia R. Zapata, Plaintiffs/Appellants,
v.
UNITED STATES of America, Defendant/Appellee.
 Nos. 86-2136, 86-2137, 86-2139 and 86-2140.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 16, 1989.
 
 Roger M. Theis, Render & Kamas, Wichita, Kan. (Paul L. Thomas, Render & Kamas and Andrew W. Hutton, Michaud, Cordry, Michaud, Hutton & Hutton, Wichita, Kan., with him on the briefs), for plaintiffs-appellants.
 Alleen S. Castellani, Asst. U.S. Atty., Topeka, Kan. (Benjamin L. Burgess, Jr., U.S. Atty., D. Kansas, with her on the brief) for defendant-appellee.
 Before HOLLOWAY, Chief Judge, and SETH and ANDERSON, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Seven and one-half months after being released from nine days' treatment as a voluntary inpatient at the Veterans Administration Medical Center ("VAMC") in Wichita, Kansas, Robert Garcia shot four people, killing Maria Robles, her son Gabriel Longoria, and Aimee Uffner, and causing permanent injuries to Karen Neil. Ms. Neil and representatives of the deceased victims sued the United States under the Federal Tort Claims Act, 28 U.S.C. Secs. 1346(b), 2671, et seq. They alleged that the VAMC had negligently breached a duty to the victims not to release Garcia because he had a known general history of mental and emotional problems which included violent tendencies. The district court granted a summary judgment to the government, dismissing plaintiffs' action on the ground, among others, that under the circumstances the VAMC owed no duty to the victims not to release Garcia.[1] The plaintiffs' appeal that decision. We affirm.
 
 BACKGROUND
 
 2
 Garcia was first admitted to the VAMC in Wichita, Kansas, as an outpatient on July 27, 1976. On this occasion, he was treated for various physical ailments and then released. He was next hospitalized at the VAMC between May 11 and May 15, 1979 for injuries reportedly suffered in an assault. On March 25, 1980, Garcia was involved in a fight for which he was later charged with aggravated assault. During January of 1981, Garcia was also twice treated as an outpatient for headaches and neck pain.
 
 
 3
 On February 2, 1981, Garcia was admitted as a voluntary psychiatric inpatient at the VAMC following a suicide attempt. He was subsequently discharged on March 12, 1981, on continued medication and under a plan whereby he would receive outpatient treatment from the VAMC Departments of Psychology and Social Work. On March 23, Garcia was voluntarily readmitted to the VAMC. He remained until April 1, 1981, at which time he was released and again placed under an active outpatient treatment plan. Apparently Garcia did not request, but did not oppose, the release to outpatient treatment.
 
 
 4
 On April 24, 1981, Garcia pleaded guilty to aggravated assault before the District Court of Sedgwick County, Kansas. As a condition of his suspended sentence, Garcia was ordered to continue his outpatient treatment by the VAMC until the VAMC chose to release him from such care. The VAMC was to report to the district court every six months regarding Garcia's treatment and progress. Garcia actively participated in and cooperated with his outpatient treatment plan, meeting with a VAMC psychologist on a fairly regular weekly or bi-weekly basis until sometime in September or October of 1981. On October 23, 1981, he was last seen by the VAMC psychologist who had been working with him.
 
 
 5
 On November 16, 1981, Garcia shot the victims.[2] One of the victims, Maria Robles, had dated Garcia. The others lived in the same house with Robles but otherwise had no apparent connection with Garcia. The record does not reveal any previous incidents of violence between any of them and Garcia, or any threats directed against them or any other person by Garcia, to the knowledge of anyone at the VAMC.
 
 
 6
 Our standard of review on appeal of summary judgment is settled:
 
 
 7
 "When reviewing a grant of summary judgment, this court must examine the record to determine whether any genuine issue of material fact pertinent to the ruling remains and, if not, whether the substantive law was correctly applied.... [W]e may affirm the granting of summary judgment if any proper ground exists to support the district court's ruling."
 
 
 8
 Setliff v. Memorial Hospital of Sheridan County, 850 F.2d 1384, 1391-92 (10th Cir.1988); see also Fed.R.Civ.P. 56(c). In the present case, none of the material facts underpinning the disposition of the case are disputed.[3] The only question is whether the district court properly applied the law of Kansas in holding that VAMC owed no duty to the plaintiffs for the allegedly negligent release of Garcia.[4]
 
 DISCUSSION
 
 9
 Plaintiffs characterize their action and the basis of their appeal as follows:
 
 
 10
 "Plaintiffs' action in the district court was predicated upon the theory that treating physicians at the VAMC failed to adhere to approved psychiatric practice in their treatment of Robert Garcia in failing to determine that he posed an extremely high risk for lethal behavior and negligently released him from inpatient care at the hospital. In support of their action, plaintiffs contended that the Kansas Supreme Court's decision in Durflinger v. Artiles, 234 Kan. 484, 673 P.2d 86 (1983), governed the case, rendering defendant liable for its negligent release of Garcia into the general public. In granting defendant's motion for summary judgment, the district court held that Durflinger and its application of general negligence principles to a similar case of injuries inflicted by a mental patient were not controlling, and that absent some special relationship between the parties, defendant owed no duty to plaintiffs respecting Garcia's violent outburst. The district court's ruling was a clear misapplication to the governing law of Kansas and should be reversed."
 
 
 11
 Brief of Plaintiffs-Appellants at 11-12 (emphasis added).
 
 
 12
 As the plaintiffs indicate, their action is one for negligent release, relying upon Durflinger and the proposition that ordinary negligence principles create, define and govern the alleged duty owed to the plaintiffs by the defendants. The central legal issue is whether, according to the decision in Durflinger, Kansas state mental hospital personnel have a duty not to release a voluntary inpatient under certain circumstances. The district court held that Durflinger applies only to involuntarily committed patients. We agree, and adopt the well reasoned analysis on the point by the district court.
 
 
 13
 Durflinger involved an action against personnel of a Kansas state mental hospital by relatives of an involuntarily committed mental patient for injuries inflicted by the patient following his release. The Kansas Supreme Court held that in certain circumstances a cause of action did exist in Kansas for the negligent release from a state institution of a patient who had violent propensities. Durflinger, 673 P.2d at 99-100. The plaintiffs stress language in that opinion to the effect that the origin of the duty underlying the cause of action found by the court lay in traditional tort concepts, including due care and foreseeability of harm, not in the involuntary commitment statute, or in the special relationship rules under Restatement (Second) of Torts Sec. 315.[5]
 
 
 14
 There is considerable merit to the argument. The Kansas Supreme Court said, among other things: "The risk to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." Id. 673 P.2d at 91 (emphasis in original). "The particular area of the law of negligence with which we are concerned herein is that of medical malpractice." Id. 673 P.2d at 92. "The ... standards for medical malpractice actions are applicable to an action for negligent release of a patient from a mental hospital." Id. 673 P.2d at 94. And, "[i]n actions where liability is predicated on negligent release of a patient from a mental hospital, general rules of negligence and medical malpractice control and there is no reason to apply the concept of special relationship and the resulting affirmative duty to take some special step to protect a third party or the public." Id. 673 P.2d at 99. Finally, the court said:
 
 
 15
 "In answering the question presented, we are only concerned with whether a duty exists in such circumstance and if so, what the duty is. We have concluded the duty exists and it is encompassed in the general duties of physicians and surgeons."
 
 
 16
 Id. 673 P.2d at 100 (emphasis in original).
 
 
 17
 At least one writer has commented upon the fact that the medical malpractice language in Durflinger raises more questions than it answers:
 
 
 18
 "The court's characterization of Durflinger as a medical malpractice action is puzzling. One wonders if the court intended to limit Durflinger to its facts. As the court itself noted: '[A] physician is obligated to his patient under the law to use reasonable and ordinary care....' The typical plaintiff in a medical malpractice action is the patient or someone acting in the patient's behalf. In Durflinger, the plaintiffs were family members of the patient, but that fact seemed irrelevant to the court's analysis. The court did not indicate whether a medical malpractice characterization would be equally applicable had the victims been total strangers rather than family members of the patient. A negligent release suit by a total stranger could hardly be considered a 'medical malpractice' action."
 
 
 19
 Note, Torts--Liability of Psychiatrists for Violent Acts Committed By Dangerous Patients--Durflinger v. Artiles, 33 Kans.L.Rev. 403, 414 (1985) (authored by Matthew D. Bunker) (emphasis in original) (footnotes omitted).
 
 
 20
 A firmer ground for the Supreme Court's reasoning lies elsewhere in the Durflinger opinion. As the district court below noted, R. Vol. I at Tab 41 (District Court Memorandum and Order 6/27/86, pp. 5-7), the Supreme Court in Durflinger relied upon the Kansas involuntary commitment statute, not on general negligence principles, as the source of the duty it found to exist:
 
 
 21
 "The hospital was required to provide care or treatment for [the mental patient]. The 'head of the hospital' was required to discharge [the mental patient] when he was 'no longer in need of "care and treatment" ' (K.S.A.1973 Supp. 59-2924 ), i.e. no longer dangerous to himself or others. The three defendant-physicians were involved in the hospital team recommendation to the head of the hospital (hospital superintendent) that [the patient] was no longer in need of care or treatment, i.e. no longer dangerous to himself or others. The making of the recommendation by the physicians to discharge or retain [the patient] was a basic part of their professional employment. This professional duty obviously was for the benefit of [the patient] and the public."
 
 
 22
 Durflinger, 673 P.2d at 93-94 (some emphasis added).[6] We agree with the district court's reading of Durflinger, and conclude that the duty recognized in that case is one arising from the Kansas involuntary commitment statutes.
 
 
 23
 Plaintiffs argue that in any event no significant distinction exists between the voluntary and involuntary commitment statutes with respect to the imposition of a duty upon responsible hospital personnel. Brief of Plaintiffs-Appellants at 19-20. That argument is not supported by the relevant statutes and statutory scheme.
 
 
 24
 The Kansas statutes provide for three classes of psychiatric patients. An "involuntary" patient is defined as "a mentally ill person who is receiving treatment under an order of a court of competent jurisdiction." Kan.Stat.Ann. Sec. 59-2902(f). An "informal" patient is one "receiving outpatient treatment at a treatment facility or who is admitted to a treatment facility pursuant to [Kan.Stat.Ann. Sec. 59-2904, a provision which establishes standards and procedures for admission and gives informal patients the right to leave the hospital during daytime hours, presumably for work or other such activities.]" Id. at Sec. 59-2902(c). Finally, a "voluntary" patient is "a person, other than an informal patient, who is receiving treatment at a treatment facility other than by order of any court." Id. at Sec. 59-2902(d).
 
 
 25
 The statutory standards for admission and discharge of "voluntary" patients are precisely the same, and in fact are grouped in the same sections, as those for "informal" patients. See Id. at Secs. 59-2904 to 06. A voluntary patient may be admitted when the hospital supervisor determines "such person is in need of treatment." Id. at Sec. 59-2905. A voluntary patient may be released when the supervisor finds "treatment ... to be no longer advisable." Id. at Sec. 59-2906 (emphasis added).[7] Significantly, and in contrast to the case of involuntary patients, neither the provisions for informal or for voluntary admission, nor discharge therefrom, require any finding that the patient is a "mentally ill person," i.e., "dangerous to self or others." See R. Vol. I at Tab 41 (District Court Memorandum and Order 6/27/86, p. 7). That is the critical distinction. To support the existence of a duty in Durflinger the court specifically quoted upon the "no longer dangerous to himself or others" determination that the hospital professionals are required to make under the involuntary commitment statutes, and it relied upon this determination to find a duty of care owing to "the public." Durflinger, 673 P.2d at 93-4. No such determination was required under the Kansas statutes when the hospital released Garcia from treatment as a voluntary inpatient.[8]
 
 
 26
 We hold that Durflinger does not govern this case. No duty recognized by the Kansas Supreme Court in Durflinger supports a cause of action by the plaintiffs against the defendants.[9]
 
 
 27
 There remains the allegation by plaintiffs on this appeal of a common law affirmative duty to control Garcia, as opposed to the issue of negligent release. See Brief of Plaintiffs-Appellants at 26-28; Reply Brief of Plaintiffs-Appellants at 1-8. In this case an affirmative duty to control would translate into whether the defendants had a duty to warn the public, to detain Garcia in the hospital, or to seek Garcia's involuntary commitment. Such a duty is based upon the "special relationship" concept contained in Restatement (Second) of Torts, Section 315.[10]
 
 
 28
 The district court declined to rule on the merits of the duty to control issue. It stated:
 
 
 29
 "Plaintiffs do not allege the existence of any relationship between themselves and defendant. Nor do plaintiffs allege a special relationship between defendant and Robert Garcia. Instead, plaintiffs rely wholly upon their premise that a special relationship analysis is unnecessary. Having rejected that premise, the court finds it unnecessary and improvident to examine whether, in fact, some special relationship existed between defendant and Garcia which may have imposed upon defendant a duty to take some action for the benefit of plaintiffs.... Because a special relationship analysis is essential to plaintiffs' cause of action, and because plaintiffs have failed to raise an issue of material fact concerning the existence of a special relationship which would give rise to a duty under Sec. 315, the court finds summary judgment against plaintiff to be appropriate."
 
 
 30
 R. Vol. I at Tab 41 (District Court Memorandum and Order 6/27/86, p. 9). If the theory in question was not presented by the plaintiffs to the district court it is not properly before us. See Grasmick v. Otis Elevator Co., 817 F.2d 88, 89-90 (10th Cir.1987); Denis v. Liberty Mutual Insurance Co., 791 F.2d 846, 848-49 (11th Cir.1986).
 
 
 31
 Our review of the record convinces us that the issue was in fact not adequately preserved or presented by the plaintiffs to the district court. In their brief to the district court, opposing defendants' motion for summary judgment, the plaintiffs expressly avoided basing their claim on a special relationship/duty to control theory:
 
 
 32
 "Plaintiffs are not arguing that defendant had some ephemeral 'duty to control' Bobby Garcia. The law does not recognize such a duty absent the special circumstances discussed herein, i.e. negligent release, negligent failure to follow standard procedures, specific threats to specific individuals. Plaintiffs do contend, however, that defendant had a duty under traditional concepts of negligence to properly assess and treat Bobby Garcia pursuant to the standards of the profession at the time, and to not release Garcia from in-patient care under the facts of this case."
 
 
 33
 R. Vol. I at Tab 38 (Memorandum in Opposition to Defendant's Motion for Summary Judgment 5/15/86, p. 26); see also R. Vol. I at Tab 41 (District Court Memorandum and Order 6/27/86, p. 4).
 
 
 34
 When a party wishing to raise a new issue on appeal has by its words or actions invited the alleged error below, it is particularly inappropriate to consider that theory of relief on appeal. See Bradford v. U.S. ex rel. Dept. of Interior, etc., 651 F.2d 700, 704-05 (10th Cir.1981). While it is true, as plaintiffs point out, that the district court discussed special relationship analysis in its order granting summary judgment, it did so only to distinguish this analysis from the duties and standards of negligent release described in Durflinger, and to point out that plaintiffs had failed to put the special relationship theory in issue. See R. Vol. I at Tab 41 (District Court Memorandum and Order 6/27/86, p. 8-9).
 
 
 35
 In any event, where voluntary patients are concerned most jurisdictions have declined to impose upon mental hospitals a common law duty of the type urged by the plaintiffs here. See, e.g., Hinkelman v. Borgess Medical Center, 157 Mich.App. 314, 403 N.W.2d 547 (1987) (Duty to control vested by involuntary commitment. No such duty for voluntary patients.); Case, 523 F.Supp. at 319) (No liability for United States under FTCA in Ohio for actions of voluntary outpatient); Hasenei v. United States, 541 F.Supp. 999 (D.Maryland 1982) (United States not liable for release of voluntary outpatient by Veteran's Administration psychiatrist under section 315 duty to control); see also Anthony v. United States, 616 F.Supp. 156 (S.D. Iowa 1985) (no duty to confine voluntary alcoholism patient without a commitment order); but see Bradley Center, 296 S.E.2d at 693. Even were we to consider the special relationship theory properly raised, we can see nothing in Kansas law or precedent to suggest that the Kansas Supreme Court would go so far under Sec. 315 analysis as to impose an affirmative duty to detain or seek an involuntary commitment in a case similar to this.
 
 CONCLUSION
 
 36
 We have considered all of plaintiffs' arguments, addressing those we deemed appropriate. For the reasons stated herein, the judgment of the district court is AFFIRMED.
 
 HOLLOWAY, Chief Judge, dissenting:
 
 37
 I respectfully dissent. I am unable to agree that the record in this case supports the granting of summary judgments against the plaintiffs. In light of the principles in Kansas law, particularly as stated in Durflinger v. Artiles, 234 Kan. 484, 673 P.2d 86 (1983), the summary judgments were erroneous.
 
 
 38
 First, I am deeply concerned because of the evidence of Garcia's mental problems. The extraordinarily strong nature of his problems obviously served to heighten the responsibilities of the physicians at the Veterans Hospital at Wichita, where he was hospitalized several times. Garcia's background is stated generally in the majority opinion, but I am concerned by additional particularly distressing circumstances.
 
 
 39
 On February 2, 1981, Garcia was admitted as a voluntary psychiatric inpatient at the VAMC following a suicide attempt. The hospital records during this hospitalization refer to Garcia's reporting a history of difficulty with his parents and wanting to know what bad dreams about murder and robbery meant. A clinical psychologist performed tests on Garcia and concluded he was a type who would be unpredictable, tending to be angry, irritable and assaultive. This hospitalization continued from February 2 until March 12, 1981 when the staff discharged him. On March 23 Garcia was voluntarily readmitted to the VAMC. He expressed fear of being alone, fear of losing control, and fear of suicidal thoughts. On this occasion he remained hospitalized until the staff discharged him on April 1.
 
 
 40
 Thus, just over seven months prior to the November tragedy of three homicides and the serious wounding of another person by Garcia, he had been hospitalized with the VAMC for over 45 days, and twice discharged at the initiative of the staff despite the distressing history of his mental illnesses. In opposition to the Government's motion for summary judgment, the plaintiffs submitted a detailed memorandum and an attached affidavit of Dr. William O'Connor. I R. Item 38. Dr. O'Connor listed 14 factors Garcia's doctors should have assessed before releasing him. These assessments would have checked for symptoms related to violence or a threat of violence. Dr. O'Connor concluded that the failure to assess Garcia on these criteria prior to his discharge was a departure from standard approved psychiatric practice. Id. In addition to Garcia's disturbing history mentioned above, there were reports of Garcia having struck persons over the head with a lead pipe and a bottle. Thus the record as a whole made a strong showing to support the plaintiffs' negligent release claim.
 
 
 41
 Second, under Kansas general negligence principles a summary judgment for the defendants dismissing these cases is unjustified. Plaintiffs allege negligence by the Government physicians at the VAMC and rely primarily on the general principles of negligence discussed in the Kansas Supreme Court's Durflinger opinion answering certified questions. Our court affirmed recovery in that case on general negligence principles. Durflinger v. Artiles, 727 F.2d 888 (10th Cir.1984). I am unable to agree that those general principles allowing recovery for negligent release are confined, as the majority opinion concludes, to cases where there is involuntary commitment of a patient pursuant to K.S.A. 59-2917 (Supp.1987). It is true that the Durflinger opinion refers to the determination by the head of the hospital, which was required, that the mentally ill patient there be discharged when "no longer in need of 'care and treatment,' " citing K.S.A. 59-2924 (Supp.1973). And the Durflinger opinion said this meant "i.e. no longer dangerous to himself or others." 673 P.2d at 94 (emphasis in original). Durflinger involved an involuntarily committed patient whom the doctors in the State hospital were required to release when he was no longer in need of care and treatment, but the opinion in no way supports the conclusion that recovery for a negligent release resulting in injury to others is limited to cases involving that particular type of determination.[1]
 
 
 42
 Durflinger says the following rationale applies to a therapist's duty in a negligent release case:
 
 
 43
 Thus the judgment of the therapist in diagnosing emotional disorders and in predicting whether a patient presents a serious danger of violence is comparable to the judgment which doctors and professionals must regularly render under accepted rules of responsibility.
 
 
 44
 Id. 673 P.2d at 93 (quoting Tarasoff v. Regents of the University of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). The reference to "a serious danger of violence" resulting from negligent release is stated in general terms, logically applicable to either a voluntary or involuntary commitment.
 
 
 45
 In sum, the negligent release principles announced in Durflinger, in harmony with Kansas law generally, are in no way confined to circumstances where the dangerous patient came into the care of the physicians following an involuntary commitment. In state facilities a voluntary patient, like Garcia, must be discharged where the head of the treatment facility determines treatment "to be no longer advisable." K.S.A. 59-2906 (Supp.1987). Thus a parallel professional judgment is required before discharge of a voluntary patient, although in somewhat different terms. The difference in no way indicates that consideration of the safety of others and the danger of violence to them is not involved. Consistent with this reasoning, one federal district judge in Kansas has interpreted Durflinger as allowing a cause of action for negligent treatment of a psychiatric patient, without distinguishing voluntary and involuntary patients or mentioning the Kansas involuntary commitment statute. See Beck v. Kansas University Psychiatry Foundation, 580 F.Supp. 527, 539-40 (D.Kan 1984). Other federal courts have discussed recovery on FTCA claims based on negligent treatment or release of dangerous mental patients without relying on state involuntary commitment statutes. See Eanes v. United States, 407 F.2d 823, 824 (4th Cir.1969) (voluntary mental patient); Soutear v. United States, 646 F.Supp. 524, 531, 538 (E.D.Mich.1986); Lipari v. Sears, Roebuck & Co., 497 F.Supp. 185, 193-94 (D.Neb.1980).
 
 
 46
 The difference between a dangerous voluntary and involuntary patient is that the former had the presence of mind to commit himself to a treatment facility. One author has suggested that even this difference is often lacking. See "The Voluntary Psychiatric Patient," Benjamin Farney, 45 Journal of Kansas Bar Association 37, 38 (1976).[2] Neither the reality of Garcia's situation, nor the general principles affording recovery for negligent release in violation of professional duty, support a narrow and technical interpretation of those principles.
 
 
 47
 I think the error of the majority's holding is revealed by considering what the outcome would have been in Durflinger had Bradley been 17 years old instead of 19. Bradley's grandparents filed the petition to have him committed. If Bradley had been 17 years old, his grandparents could have made a written application to have him voluntarily committed.[3] Even if Bradley had been unwilling, according to Kansas law he would still have been classified as a voluntary patient. Under the majority's holding, his doctors would have had no duty to the public for his negligent release, no matter how violent and dangerous he was, and no matter how many people they knew he might kill. Or a patient could enter a mental hospital voluntarily, deteriorate rapidly after admission, and finally kill several other patients. The very next day, according to the majority's opinion, the hospital staff could discharge him, without any liability, even though they knew he might likely kill again. Under the majority opinion, in neither of these situations could the hospitals or physicians have been liable for a negligent release. This distressing interpretation of Durflinger is not supported by the Kansas Supreme Court's opinion.
 
 
 48
 Third, I think that by denying recovery because of procedures set out in the Kansas Probate Code, we analyze Kansas tort law at a different level than is proper in this Federal Tort Claims Act case. The state statutes would not control the internal procedures governing the decisions of the physicians and psychotherapists at the federal VAMC. Veterans Administration hospitals have their own procedures on the care and treatment of psychiatric patients. See Castillo v. United States, 552 F.2d 1385 (10th Cir.1977). Such regulations are there cited at length. Id. at 1387.[4]
 
 38 U.S.C. Sec. 621 (1986) provides:
 
 49
 The Administrator shall prescribe--
 
 
 50
 (1) such rules and procedure governing the furnishing of hospital, nursing home, and domiciliary care as the Administrator may deem proper and necessary;
 
 
 51
 (2) limitations in connection with the furnishing of hospital, nursing home, and domiciliary care; and
 
 
 52
 (3) such rules and regulations as the Administrator deems necessary in order to promote good conduct on the part of persons who are receiving hospital, nursing home, or domiciliary care in Veterans' Administration facilities.
 
 
 53
 Regulations promulgated under this statutory rule-making power are controlling instead of a conflicting state statute. See Texas Employers' Insurance Association v. United States, 569 F.2d 874 (5th Cir.1978).[5]
 
 
 54
 It is true that the Federal Tort Claims Act incorporates negligence principles from state law. 28 U.S.C. Sec. 1346(b) (1986). Nevertheless, under the Act claims may be asserted against the Government for the negligence of federal employees when the negligence is related to conduct regulated by federal rules. In Sheridan v. United States, --- U.S. ----, ----, 108 S.Ct. 2449, 2454, 101 L.Ed.2d 352 (1988), the Supreme Court reversed dismissal of a Federal Tort Claims Act suit for negligent conduct of Government personnel in violation of federal regulations on possession of firearms. See also Berkovitz v. United States, --- U.S. ----, ---- - ----, 108 S.Ct. 1954, 1959-63, 100 L.Ed.2d 531 (1988); Griffin v. United States, 500 F.2d 1059, 1066-68, 1069 (3rd Cir.1974).
 
 
 55
 The proper framework for analyzing an FTCA case in which state negligence law and federal regulations both apply was elucidated in Underwood v. United States, 356 F.2d 92, 99 (5th Cir.1966):
 
 
 56
 The law of Alabama imposes upon persons having custody of firearms or other dangerous agencies a high degree of care to the end that third persons should not be injured through those agencies. The law generally as to the handling of firearms requires reasonable or ordinary care, or a degree of care commensurate with the danger. We think that it was in recognition of some such duty that the precautionary measures were adopted by the Air Force. We need not decide to what extent, if any, the state law is applicable. The precautions to be exercised in permitting the withdrawal of firearms and ammunition are so fully prescribed by the Regulation and instructions that it is not necessary to resort to state law. That law is, however, pertinent to meet the test of the Act, which imposes on the United States liability relating to tort claims "in the same manner and to the same extent as a private individual under like circumstances...." (citations omitted).
 
 
 57
 Thus, general principles of Kansas negligence law determine whether Kansas would recognize a cause of action between private parties under the circumstances of this case. In that regard, Durflinger held that "[w]e recognize as a valid cause of action, a claim which grew out of a negligent release of a mental patient who had violent propensities.... We have concluded the duty exists and it is encompassed in the general duties of physicians and surgeons." 673 P.2d 99-100. Thus, Kansas clearly recognizes a cause of action for negligent release of a dangerous mental patient.
 
 
 58
 The procedural rules by which a Veterans Administration physician's conduct is governed are not those prescribed by the state statutes. The incorporation of general tort principles from state law does not subject the federal institutions to state procedures in their internal operations. Here, therefore, the state statutes on voluntary and involuntary commitments do not control the professional procedures in the Veterans Administration facility, although Kansas general negligence principles apply in determining whether wrongful acts or omissions in carrying out those procedures give rise to liability of the Government.
 
 
 59
 In sum, in light of this record and the principles of Kansas law which are not technically restrictive against recovery for negligent release of mentally ill patients, the summary judgments against these plaintiffs are clearly unjustified.[6] In any event the Government, as the moving party, has not demonstrated its entitlement to judgment beyond a reasonable doubt. Mustang Fuel Corp. v. Youngstown Sheet & Tube Co., 516 F.2d 33, 36 (10th Cir.1975). To set aside these summary judgments would not, of course, mean automatic recovery for these plaintiffs; it would only afford them the opportunity to present their substantial claims at trial--an opportunity they are entitled to have under Kansas law and the remedial provisions of the Federal Tort Claims Act that "waives the Government's immunity from suit in sweeping language." United States v. Yellow Cab Co., 340 U.S. 543, 547, 71 S.Ct. 399, 402, 95 L.Ed. 523 (1951).
 
 
 
 [1]
 The district court's ruling was based upon multiple alternative grounds. See R. Vol. I at Tab 41 (District Court Memorandum and Order 6/27/86, pp. 7-10). We need reach only the first basis enunciated by the district court, that the duty not to negligently release is a statutory duty inapplicable to these facts
 
 
 [2]
 In spite of a plea of not guilty by reason of insanity, a jury found Garcia guilty of three counts of murder and one count of aggravated robbery. Garcia is now serving three consecutive life terms at the Kansas State Penitentiary
 
 
 [3]
 Plaintiffs do contend that material issues of fact remain, rendering a grant of summary judgment inappropriate. Brief of Appellants at 12. Plaintiffs, however, can only point to disputed facts raised by the government below in the event the court chose to invoke a special duty analysis that would impose duties beyond the narrow duty to warn readily identifiable victims. See R. Vol. I at Tab 40 (Defendant's Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment 5/23/86, p. 7). On appeal, however, the government has apparently waived these arguments of fact, see Brief of Defendant-Appellee at 1, 3, and in any event we do not find contentions regarding the existence of a special relationship "material" (i.e., affecting the outcome, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)) to our ruling. See discussion in text, infra
 
 
 [4]
 Federal courts sitting in FTCA cases are required to apply the law of the state in which the cause of action arose. 28 U.S.C. Secs. 1346(b), 2674; Richards v. United States, 369 U.S. 1, 2-3, 82 S.Ct. 585, 587-88, 7 L.Ed.2d 492 (1962); Weiss v. United States, 787 F.2d 518, 524 (10th Cir.1986)
 
 
 [5]
 See discussion, infra
 
 
 [6]
 The Supreme Court's interpretation of "no longer in need of care or treatment" as "no longer dangerous to [the patient] or others" is best understood in light of Kan.Stat.Ann. Secs. 59-2917, 59-2917a, and 59-2923. See Durflinger, 673 P.2d at 93. These provisions all deal with involuntary admissions and provide the criteria for involuntary commitment, periodic review of medical progress and status, and discharge by application. All three require a finding by "clear and convincing" evidence that the patient is a "mentally ill person." Kan.Stat.Ann. Sec. 59-2902(a) defines a "mentally ill person" as "any person who is mentally impaired to the extent that such person is in need of treatment and who is dangerous to self or others ..." (emphasis added). See In re Gatson, 3 Kan.App.2d 265, 593 P.2d 423, 425 (1979). Section 59-2924 does not explicitly incorporate the "mentally ill person" standard utilized in these provisions, but given its pervasiveness in these sections and its greater relative specificity as detailed in section 59-2902(a), it understandably serves as an amplification of section 59-2924's "no longer in need of care or treatment."
 
 
 [7]
 A voluntary patient may request discharge, and a hospital is then required to release the patient within the next three days. Id. at Sec. 59-2907. A former version of this statute, which allowed a five-day period, expressly noted that one purpose of this discretionary holding period was to permit commitment proceedings to be brought, possibly by the hospital. See Farney, The "Voluntary" Psychiatric Patient, 45 J.Kan.B.A. 37, 42 (1976); Cobean, The New Kansas Philosophy About "Care or Treatment" of the "Mentally Ill Person" and Obtaining a Guardian or Conservator, or Both, 6 Washburn L.J. 448, 451 (1967). Section 59-2907, however, does not impose any duty upon the hospital to seek commitment. It does not even suggest any criteria by which a hospital should decide whether or not to seek commitment. In any event, the statutory language at no point suggests any obligation by the hospital to third parties to exercise the power to seek commitment
 
 
 [8]
 To further buttress their argument that the Durflinger negligent release duty derives from traditional tort concepts that would extend to voluntary patients, plaintiffs cite Bradley Center, Inc. v. Wessner, 250 Ga. 199, 296 S.E.2d 693 (1982) and Eanes v. United States, 407 F.2d 823 (4th Cir.1969). The Georgia Supreme Court in Bradley, although repeatedly stressing that it was merely applying "traditional tort principles," clearly relied upon a special relationship analysis to circumvent the "general rule" that "there is no duty to control the conduct of third persons to prevent them from causing physical harm to others." Bradley, 296 S.E.2d at 696. Bradley, thus, had before it theories of relief which we do not. In Eanes, a voluntary mental patient attacked his wife while on leave from the hospital for a trial visit at home. Eanes is inapposite for two reasons. First, although the Fourth Circuit spoke briefly of a duty of care owed by the "attendant experts who are in charge of the mentally ill," the actual holding of the court was to affirm the trial court's finding of no actionable negligence on the part of the hospital. No liability running to victims of voluntary patients was actually found. In fact, the court noted that the right of the voluntary patient to demand discharge at any time somewhat vitiated the responsibility of the trial visit program for the injuries caused. Second, Eanes involved trial home visits of apparently short duration (15 days in the instant case), not actual discharge, a distinction of some import considering the implications for custody and responsibility by the hospital. Trial visits are more clearly part of the ongoing treatment of the patient, with the hospital expecting to resume actual physical custody of the patient. Such is not the case with a discharge, in which the hospital completely releases the patient from custody and control
 Even were we to accept these cases for the proposition that mental hospitals may be held liable to third parties for the negligent release, such a rule is clearly a minority rule only. Most cases, which typically involve a special relationship analysis, as with Bradley, decline to hold mental hospitals liable. See discussion infra.
 
 
 [9]
 An alternative ground for finding no duty to exist is the time lapse of seven-and-one-half months between the release of Garcia and the injury to the plaintiffs. See Novak v. Rathnam, 153 Ill.App.3d 408, 106 Ill.Dec. 226, 229, 505 N.E.2d 773, 776 (1987) (No causal connection in tort where injury occurred 14 months after release of mental patient.); Harris v. State, 48 Ohio Misc. 27, 358 N.E.2d 639 (Ct.Cl.1976) (No duty/proximate cause where injury occurred more than 2 years after release.); Case v. United States, 523 F.Supp. 317, 319 (S.D.Ohio 1981), aff'd, 709 F.2d 1500 (6th Cir.1983) (No liability for federal government for actions of voluntary out-patient 14 months after last date of treatment.)
 
 
 [10]
 Section 315 of the Restatement (Second) of Torts (1965) provides:
 "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
 "(a) a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
 "(b) a special relationship exists between the actor and the other which gives to the other a right to protection."
 Several jurisdictions have adopted the analysis of section 315, and by it have held psychiatrists and mental hospitals to affirmative obligations to control dangerous patients and to warn potential victims of such patients. Lipari v. Sears, Roebuck & Co., 497 F.Supp. 185 (D.Neb.1980); Tarasoff v. Regents of University of California, 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976) (en banc).
 In Durflinger the Kansas Supreme Court, although citing the Lipari case extensively, expressly declined to address the issue of whether a common law duty such as that urged here exists in Kansas. 673 P.2d at 99. The Supreme Court, in fact, made it clear that it could "end the discussion" of negligent release without recourse to these "affirmative duties" cases, but nevertheless believed it appropriate to "distinguish" them. Durflinger, 673 P.2d at 94. The citation of Lipari, therefore, should not be read, contrary to plaintiffs' assertions, as an incorporation of Lipari 's duty analysis.
 
 
 [1]
 When Durflinger was decided, K.S.A. 59-2924 (Supp.1973) provided for such release when the patient was "no longer in need of care and treatment." 673 P.2d at 94. The statute now provides for such release when "the patient is no longer in need of treatment." Since the definition of treatment includes any service to promote the mental health of the patient rendered by a qualified professional licensed or certified by the state, I see no significant difference for our purposes. See K.S.A. 59-2902(p) (Supp.1987)
 
 
 [2]
 The author is Judge Farney, a Johnson County Probate Judge
 
 
 [3]
 Any person may be admitted to a treatment facility as a voluntary patient when there are available accommodations and in the judgment of the head of the treatment facility ... such person is in need of treatment therein.... If such person is less than eighteen (18) years of age then the parent or person in loco parentis to such person may make such written application. K.S.A. 59-2905 (1983)
 
 
 [4]
 These regulations were said not to set the standard of conduct for negligence, id. at 1389, and the case was decided on general negligence principles. It is noteworthy that this court's opinion said that the regulatory procedure was "designed for the protection of the patient and others from the effects of the patient's illness...." Id. at 1389 (emphasis added)
 
 
 [5]
 I am mindful of the fact that the parties did not plead or place in our record any Veterans Administration regulations. Nevertheless, we cannot ignore the fact that the statute provides for the regulations and that they exist. State procedures are therefore not controlling in the VAMC facility. The parties in this case would be entitled, after the summary judgment stage, to develop the record on Veterans Administration regulations that are applicable
 
 
 [6]
 The majority opinion states that an alternative ground for finding no duty to exist here is the time lapse of seven and one-half months between the release of Garcia and the deaths and injuries he caused. This is not a proper basis for summary judgment here
 The time intervening is related to the question of proximate causation. This is indicated by the opinions cited by the majority. Novak v. Rathnam, 153 Ill.App.3d 408, 106 Ill.Dec. 226, 505 N.E.2d 773 (1987), held that the time lapse of 14 months was too great and thus "the events were just too far removed in time to establish the requisite causal connection." Id. 106 Ill.Dec. at 226, 505 N.E.2d at 773.
 In Case v. United States, 523 F.Supp. 317 (S.D.Ohio 1981), the court held there was no liability of the Government for actions of a voluntary out-patient 14 months after his last date of treatment where community standards were followed in his psychiatric treatment. Id. at 319. This apparently was a ruling involving one element of lack of proximate cause. Harris v. State, 48 Ohio Misc. 27, 358 N.E.2d 639 (Ct.Cl.1976), held that the state Department of Health was not responsible for an assault committed by a former inmate and current out-patient of its facilities that took place approximately two years after his discharge and where the discharge had been in accordance with state statutes.
 In our case, in view of Garcia's turbulent mental difficulties in 1981, much closer in time to these murders and assaults, I am convinced that a summary judgment based on lack of proximate cause due to passage of time is not justified. This is a fact issue here for resolution on consideration of all the circumstances related to proximate cause.